In re M & M TRANSPORTATION
COMPANY, Debtor.

M & M TRANSPORTATION
COMPANY, Plaintiff,

v.

SCHUSTER EXPRESS, INC., Defendant.

In re DRAKE MOTOR LINES,
INC., Bankrupt.

John M. CHILCOTT, Trustee of Drake Motor Lines, Inc., Bankrupt, Plaintiff,

v.

NATIONAL RETAIL TRANSPORTATION, INC., Tel. Inc., and Walsh Trucking Co., Inc., Defendants.

Bankruptcy Nos. 77–B–122, 78–B–2201.

United States Bankruptcy Court,
S. D. New York.

Sept. 2, 1981.

Finley, Kumble, Wagner, Heine, Underberg & Casey, New York City, for plaintiff M & M Transportation Co.

Otterbourg, Steindler, Houston & Rosen, P. C., New York City, Brenner, Saltzman & Wallman, P. C., New Haven, Conn., for defendant Schuster Express, Inc.

Siegel, Sommers & Schwartz, New York City, for plaintiff Drake Motor Lines, Inc.

Platzer & Fineberg, New York City, for defendants National Retail Transportation, Inc., Tel, Inc. and Walsh Trucking Co., Inc.

## OPINION

ROY BABITT, Bankruptcy Judge:

### I.

The issue central to both of these actions involves the allocation of the risk of financial loss on either the seller or the purchaser of property of estates in bankruptcy occasioned by subsequent events when the agreements of sale are silent as to the occurrence of those events.

The property touched by the events following their purchase at open auction sales, in keeping with accepted procedures in bankruptcy sales, are operating rights conferred on motor carriers in accordance with practices of the Interstate Commerce Commission (ICC), thereby authorizing such carriers to haul specific commodities between designated points on designated routes.

The event which concededly impacted adversely on the value of these properties occurred after they were sold but before the purchase prices were fully paid. This event was the enactment on July 1, 1980 of the Motor Carrier Act of that year, Pub.L. 96–296, 94 Stat. 793 et seq. This statute achieved a sweeping change in the trucking industry. It reversed nearly half a century of experience under prior legislation, 49 U.S.C. §§ 1 et seq., by effectuating its policy of deregulation, a policy designed to lessen the national government's economic regulation of this industry.

The regulatory structure under prior law had the effect of severely limiting entry into the trucking industry, for it stringently limited the opportunity of a motor carrier to obtain operating rights from the ICC. An inevitable corollary of these restrictions was the benefit to those who were success-ful in procuring ICC granted operating rights of limited competition, for if no other rights were conferred, the successful carrier had a virtual monopoly. The value of such exclusivity was plain. Indeed, in recognition of the intrinsic value of these federally given operating rights, motor carriers carried them on their books as valuable assets. Apart from the benefit derived from a continued operation in a virtually competition free area, holders of these rights were also able to profit from the restrictive nature of the regulations governing the marketplace when the time came to sell their rights. Substantial profit could be had from a sale as it was easier for carriers to gain entry into a marketplace by the purchase of existing rights. While the ICC had to approve the sale, at least the routes, designated points and type of haulage had already undergone administrative scrutiny.

The deregulation flowing from the 1980 statute has changed the face of all this.[1] The new statutory and regulatory structure contemplates virtually unlimited entry and provides for a simple and expeditious grant of operating rights upon payment of a minimal fee. An existing operating right, previously valued at cost and subject to amortization, now must be written off as an extraordinary loss.[2] It is thus plain that the value of previously granted rights to operate on the nation's highways has been permanently impaired by the elimination of monopolistic benefits which, of course, impacted adversely on a profitable operation.

It is against this setting that the actions now to be dealt with must be considered. While both of the bankruptcy petitions were filed under the controlling provisions of the now repealed Bankruptcy Act of 1898, it appears that resolution of these disputes requires application of general principles of law seemingly applicable as

1. See generally, Sheler, *Why Teamsters Union Is Running Scared*, U.S. News and World Report, August 3, 1981; *Congress Clears Major Bill Cutting Trucking Regulation*, 38 Cong. Q. Weekly Rep., No. 26, p. 1806 (June 28, 1980).

2. See generally, Statement of Financial Accounting Standards No. 44, *Accounting for Intangible Assets of Motor Carriers, December 1980*; published by the Financial Accounting Standards Board.

well to bankruptcy sales within the scheme of the 1978 Bankruptcy Code.[3]

## II.

## THE FACTS

### A. *M & M TRANSPORTATION COMPANY v. SCHUSTER EXPRESS, INC.*

On January 19, 1977, M & M Transportation Company, (M&M) filed its petition for an arrangement under Chapter XI of the 1898 Bankruptcy Act, Section 322, 11 U.S.C. (1976 ed.) § 722. Its plan was confirmed on November 6, 1978. M&M, in the business of intra and interstate transport, was the owner of ICC operating rights covering several territories.

In the course of the administration of its Chapter XI case, M&M decided to sell certain of its operating rights, and a public sale by auction was held before the court on June 22, 1977. Paul Schuster, President and chief executive officer of Schuster Express, Inc. (Schuster), successfully bid on a group of these rights, Group B, for $650,-000. The parties then entered into a written agreement of sale (M&M agreement) pursuant to which Schuster made an initial $65,000 payment. This agreement, approved by this court on July 6, 1977, was made "under the rules and regulations of the ICC", and it envisioned full payment upon final ICC approval of the sale of these operating rights. Pursuant to paragraph 3(b) of the agreement,[4] lease rental payments were made for the period of October, 1977 through September, 1980, in the total amount of $289,250. During this period, Schuster operated under temporary authority.[5]

Approval was obtained by ICC order on March 27, 1980, and it became effective thirty days later. The M&M agreement provided for a closing to be held within 65 days of this order and ICC regulations required Schuster to complete the purchase within ninety days of the effective date of the ICC order.[6] The July 1, 1980 enactment of the Motor Carriers Act then intervened and, as seen, drastically changed the regulatory climate, thus diminishing the value of the rights Schuster bought. Counsel for Schuster then notified M&M that it would not honor the court approved contract of sale, and refused to pay the $295,750. balance due as Schuster believed it was excused from all further performance as its purpose in entering into the M&M agreement had been frustrated by the enactment of the 1980 statute.

On November 19, 1980, M&M filed its complaint in this court to recover the balance due on the contract. Bankruptcy Rules 701(1) and 703; 411 U.S. 1068, 93 S.Ct. 3147, 37 L.Ed.2d lxvi *et seq.* Schuster, the defendant, answered and raised the defense of commercial frustration, based on the deregulation statute and the destruction of the value of the purchased rights. The essence of Schuster's position is that at the time of the execution of the agreement of sale, it believed the then existing regulatory framework would remain in existence, and as the change in the regulatory climate could not be foreseen, it should now be relieved from further performance. Schuster also interposed a counterclaim for the $65,000. paid as a deposit.

---

3. Although the 1898 Act was repealed effective October 1, 1979, as provided for by Section 401(a) of Title IV of the 1978 statute, Pub.L. 95–598, 92 Stat. 2682, the former will continue to control the disposition of bankruptcy petitions filed before October 1, 1979, as here. Section 403(a), 92 Stat. 2683, makes this clear.

4. Paragraph 3(b) provides:
"Buyer shall pay to seller as rental for said temporary lease of said operating rights, the sum of $6,500.00 per month for the first eighteen months after court approval of the lease and $9,750.00 per month thereafter which shall

be applied against and in reduction of the purchase price if the application under Section 5 is approved".

5. These payments were paid as rental for these operating rights, as Schuster leased them from M&M while the applications for ICC approval were pending with that agency. Schuster does not seek to recover any portion of these payments in this action.

6. Schuster obtained an *ex parte* 60-day extension from the ICC for consummation of the sale.

M&M then moved for summary judgment in its favor pursuant to Rule 56, F.R.Civ.P., made applicable to this adversary proceeding by Bankruptcy Rule 756, 411 U.S. 1084, 93 S.Ct. 3159, 37 L.Ed.2d lxxii. The statement of the undisputed material facts, called for by District Court Rule 3(g), was annexed with affidavits and documents, all permitted by Rule 56. Schuster did not submit a statement controverting M&M's statement of the material facts, but did submit affidavits in opposition.

### B. *DRAKE MOTOR LINES, INC. v. NATIONAL RETAIL TRANSPORTATION, INC.*

On December 5, 1978, Drake Motor Lines, Inc. (Drake), a transporter of goods over both intra and interstate lines, was adjudged a bankrupt under the 1898 Bankruptcy Act. John M. Chilcott was elected and has qualified as trustee. Pursuant to his obligation to liquidate the estate, he determined it most beneficial to sell Drake's ICC operating rights at public auction, an auction held on January 25, 1979. Prior to this date, numerous articles appeared in both industry-wide and general circulation publications reporting the proposed changes under study by Congress and the ICC, including out-and-out deregulation of the trucking industry.[7] Indeed, the specter of almost certain industry-wide change weighed heavy on those with an interest in the trucking industry. The press of this concern, in the context of this dispute, is illustrated by the fact that at the January 25 auction, there was discussion amongst the bidders as to the possible impact of reform on the value of the operating rights to be sold by Drake's trustee. The affidavits and documents submitted by the trustee indicate that the rights were offered and sold at a deflated value, a factor directly linked to the rumors of possible change.[8]

At this auction, Walsh Trucking Co., Inc. (Walsh) and Tel, Inc. (Tel), successfully bid on various packages of operating rights. Tel entered into an agreement (Drake agreement) with the trustee to purchase certain rights for a total of $6,000, with $900 paid as a deposit. Walsh executed a similar agreement to purchase rights for $322,000, and $48,300 was paid on deposit. These sales were subject to final approval by the ICC, and closings were to be held within 65 days of the ICC final order of approval. Nowhere did these agreements provide for the contingency of change in the ICC regulatory framework. Both agreements were subsequently confirmed by order of this court.

On January 25, 1979, the same day as the auction, Tel assigned its interest in a portion of the rights to National Retail Transportation, Inc. (NRT). This assignment did not release Tel from liability. Walsh assigned its entire right to the newly acquired rights to NRT, and similarly, was not released from liability.

Thereafter, NRT did all required of it pursuant to applicable law and the agreement of sale to gain the requisite ICC approval. On September 5, 1979 temporary operating authority was granted by the ICC to NRT,[9] and on May 12, 1980 that agency issued its final order approving the transfer

---

**7.** See, *Waiting for D Day*, Forbes, December 25, 1978 at 41; Burck, *Truckers Roll Toward Deregulation*, Fortune, December 18, 1978 at 74; *Dereg, Transportation's Sunrise or Sunset?*, Fleet Owner, December, 1978 at 88; *Major Reform of Trucking Industry Appears Almost Certain*, Handling and Shipping Management, December, 1978 at 10.

**8.** The Drake operating rights were appraised by William Becker, Esq., a transportation attorney. His January 5, 1979 appraisal states: "Recent administrative action of the ICC and recent legislative proposals to reduce or eliminate entry restrictions in the motor carrier industry make it difficult to estimate prices which may be derived from the sale of Drake's

operating authority. There also is enclosed a compilation of recent administrative action which indicates that there will be reduced entry limitations and that increased competition will be encouraged in the industry. This recent policy emphasis clearly has had a depressant effect on the value of motor carrier operating rights certificates. As a result, the prices that will be derived from the sale of the Drake rights will be materially less than what could have been obtained even six months ago".

**9.** Paragraph 3 of the Drake Agreement provides:

"(a) If by its administratively final and effective order, the ICC shall grant [temporary oper-

which became administratively final on June 2, 1980.

As the Drake agreements called for closing after the issuance of the final order of approval, plaintiff made repeated demands for payment of the outstanding balance on defendants NRT, Walsh and Tel, but they refused to comply. This prompted Drake's trustee, the plaintiff, to file a complaint with this court against Walsh, Tel and NRT to recover $274,250, the balance owing on the agreement.[10] Rule 701(1), 703, 411 U.S. 1068, 93 S.Ct. 3147, 37 L.Ed.2d lxvi *et seq.* Defendants Walsh, NRT and Tel answered. They denied the allegations of the complaint and interposed the defense of commercial frustration, resting on the conceded fact that deregulation had totally destroyed the value of the rights purchased and thus effectively frustrated defendants' purpose of entering into the Drake agreement at all. They alleged that rescission was warranted, and counterclaimed for a refund of the $48,300 paid upon the contracts.

The Drake trustee has moved for summary judgment, Bankruptcy Rule 756, 56 F.R. Civ.P., and has filed the statement required by District Court Rule 3(g), affidavits and supporting documents. Defendants oppose this motion, submitting a statement of the material facts which they say necessitates a trial, and supporting affidavits were also filed on the claimed issue of the material facts.

### III.

### THE SUMMARY JUDGMENT MOTIONS

And so the court turns to the appropriateness of summary judgment in light of the above-mentioned facts. Summary judgment, Rule 56 F.R.Civ.P., is a tool to facilitate the most expeditious administration of justice, allowing the court to smoke out those cases not requiring a trial. *S.E.C. v. Research Automation Corp.*, 585 F.2d 31 (2d Cir. 1978). It is the moving parties' burden to demonstrate the absence of genuine issue as to the facts material to the litigation. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). As this court is thus sensitive to the strict adherence to the prerequisites for doing away with a litigant's right to an evidentiary hearing, all materials submitted have been carefully scrutinized.

Both movants[11] followed the command of District Court Rule 3(g) and have submitted comprehensive statements of those material facts not in dispute, and when read with the other moving papers, they do not set forth a factual dispute warranting a trial.

Defendant Schuster, in the M&M suit, has not submitted its opposing view of the facts, and therefore, it is deemed to agree with those facts outlined in M&M's moving papers. A thorough reading of the affidavits Schuster submitted reinforces the view that there is general agreement as to the controlling facts described by the plaintiff moving party.

The defendants NRT and Walsh have submitted opposing papers in full compliance with the law, facially controverting the factual setting as seen by Drake's trustee. However, these materials do not contain the requisite particulars to raise an

---

ating authority], the buyer shall, on a date ('Temporary Authority Date') designated by it, but within the period prescribed in said order, commence to operate under a temporary lease of the operating rights . . .
(b) The buyer shall pay to the seller, as rental for said temporary lease of said operating rights, during the first eighteen (18) months of temporary operations, the sum of one (1%) per cent per month for operations under temporary authority and the sum of 1.5% per month thereafter until consummation or termination of this agreement, whichever sooner occurs. All rental payments shall be applied against,

and in reduction of, the purchase price if the application under Section 5 is approved."

10. This outstanding balance reflects a credit for a group of rights determined to have been dormant and nontransferrable by the Massachusetts Department of Public Utilities, Commercial Motor Vehicle Division. (Intra-state operating rights).

11. Although plaintiff M&M is a Chapter XI debtor and debtor in possession, it has the same power as does Drake's trustee to do what he has done. Section 342, 11 U.S.C. (1976 ed.) § 742, makes this plain.

issue of material fact. *Applegate v. Top Assoc. Inc.*, 425 F.2d 92 (2d Cir. 1970). They merely contain unsubstantiated speculations and conclusions of fact and law, all insufficient bases to defeat this motion. It is concluded that these defendants have advanced no feasible basis to warrant a trial, *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438 (2d Cir. 1980), and that the only issues are legal ones which the court may resolve without the necessity to have the curtain ascend on a trial, *Heyman v. Commerce & Industry Insurance Co.*, 524 F.2d 1317, 1319 (2d Cir. 1975).

## IV.

### THE LEGAL ISSUES

#### A. *THE BANKRUPTCY COURT'S POWER TO SET ASIDE A CONFIRMED JUDICIAL SALE*

The first legal issue raised in these disputes concerns the reach of the power of this court to set aside a previously confirmed judicial sale. Plaintiffs correctly point to the general policy of the bankruptcy courts to uphold regularly conducted sales so as to engender and maintain their stability and the integrity of the process, 4B *Collier on Bankruptcy* (14th ed.) ¶ 70.98, for it is the "policy of the law to maintain judicial sales and every reasonable inducement will be indulged to uphold them". *Manson v. Duncanson*, 166 U.S. 533, 17 S.Ct. 647, 41 L.Ed. 1105 (1897).

And in pursuance of this policy, courts apply the doctrine of *caveat emptor* to a confirmed judicial sale as such a sale is presumed to be final. Plaintiffs believe it would be inequitable to the creditors of these companies to permit a purchaser who speculates upon the value of the property purchased, and whose bid reflects his underlying reasons to bid as he does, to be relieved of his obligations because the expectations did not materialize. In short, plaintiffs insist that the quantum and extent of the rights of the defendants are governed solely by the terms of the sales.

But the policy behind the integrity of the judicial sale system is not an inexorable command, unyielding and implacable in all cases. Manifestly, blind adherence to the most laudable policy in the face of egregious facts surrounding a sale could also impact adversely on the integrity of the system. Thus, sales tainted by fraud or misrepresentation will not be enforced. Moreover, in its general power to oversee the process that is bankruptcy, this court must possess the general power to police such sales, and to set them aside "if the grounds are sufficient to invalidate a similar private transaction on equitable grounds". *In re Burr Mfg. Co.*, 217 F. 16 (2d Cir. 1914); 6 *Remington on Bankruptcy* § 2563. A decision to do this lies within the sound discretion of the bankruptcy judge, *In re Lamont*, 453 F.Supp. 608 (N.D.N.Y. 1978); *aff'd* 603 F.2d 213 (2d Cir. 1978), for the intrinsic structure of the sales which are the subject of these actions is "within the zone of interests which the Bankruptcy Act seeks to protect and to regulate". *In re Harwald Co.*, 497 F.2d 443, 444–5 (7th Cir. 1974). See also, *In re Beck Industries, Inc.*, 605 F.2d 624 (2d Cir. 1979).

This court, as it has been so frequently reminded, sits as a court of equity, *Bank of Marin v. England*, 385 U.S. 99, 87 S.Ct. 274, 17 L.Ed.2d 197 (1965), and examines the facts before it with such principles in mind, for its equitable power extends to more than the typical dispute, *e. g., Pepper v. Litton*, 308 U.S. 295, 304–5, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939), and "pervades bankruptcy administration", *In re Beck Industries, Inc., supra*, at 634. Although most cases in which bankruptcy sales have been set aside involved defects in the sale process, the court may set aside a sale where there is an egregious disproportion between the sale price and the value of the contract sold so as to "shock the conscience of the court". *In re Jewett & Sowers Oil Co.*, 86 F.2d 497 (7th Cir. 1936). The court "engaged as a court of equity in the administration of a bankrupt's estate [sic] will not stand on any niceties of pleading where the facts are all before the court and cry out for relief". *Id.* at 498. In the proper circumstances, this court may therefore set

aside a confirmed sale and discharge the purchaser from further obligation where events subsequent to confirmation strip the assets of value and make the purchase worthless.

As it is clear, therefore, that the power exists, a power to be sparingly used where the facts cry out for relief, the court now turns to these sales to ascertain how plaintive those cries are and whether, on the defendants' theory, those cries should be heeded.

## B. *COMMERCIAL FRUSTRATION*

The defendants proceed on a common theory arising out of the 1980 enactment which deregulated an industry they thought they had to themselves. They call their theory commercial frustration and insist that if applicable principles support this theory, then these are instances in which the court's power should be exercised benignly in their favor.[12] In simple terms, defendants ask this court to act in their favor because what they bought for the price they bargained for has become considerably less valuable. Plaintiffs view things differently. They characterize the fact of statutory deregulation as an element of ordinary business risk generally assumed in such contracts, and considered in the purchaser's determination of how much the property is worth to him. What is not disputed is the fact that the intrinsic value of the ICC rights the defendants bought is now, to all intents and purposes, nil if the defendants hoped by their purchase at the prices paid to have a monopoly to the exclusion of others. If the court concludes that the defendants must be held to their bar-

gains, they will be forced to pay in full for something which no longer justifies the prices they bid.

There is no dispute that these defendants were represented at the sales by knowledgeable businessmen, all cognizant of the risks involved and mindful of the industry. A policy of deregulation was considered by the national legislature as far back as 1971, when the Nixon Administration introduced the Transportation Regulation Modernization Act.[13] That these rights were at all times subject to regulation by the ICC or by the legislature cannot be questioned. Although defendants protest, raising the absence of certainty as to ensuing change, absolute knowledge is not the standard. It would be futile for the courts to require absolute certainty in the weighing of risks assumed in a contract. Equity should not intrude itself where knowledgeable parties contract and where they have not been overborne by actions of the other party. If anything, the plaintiffs, as vendors of property, were subject to the superior knowledge of these vendees as to the value of the operating rights to be sold and the possibility that there might be few or even no bidders. Mindful of all this, the court can only reaffirm the observation that the legal process and the equity process do not necessarily lead to the same result. *Haller v. Esperdy*, 397 F.2d 211 (2d Cir. 1968). And under the facts here, the stability of the process and the public policy inherent in upholding the validity of freely negotiated contracts outweigh the call to do equity merely because the defendants find less hidden treasure in what they bought than they hoped for.[14]

12. The Courts are not consistent in their discussions of this doctrine. It is discussed under the headings of frustration of purpose, *Haas v. Pittsburgh National Bank*, 495 F.Supp. 815 (W.D.Pa.1980), frustration of performance, *119 Fifth Avenue, Inc. v. Taiyo Trading Co.*, 190 Misc. 123, 73 N.Y.S.2d 774 (Special Term 1947), or impossibility, *Transatlantic Financing Corp. v. United States*, 363 F.2d 312 (D.C.Cir. 1966). For consistency, this opinion will keep to the phrase commercial frustration.

13. See generally, *We Can Do More Than Just Talk About Motor Carrier Regulatory Reform*, 46 ICC Practitioners Journal 669 (1978).

14. If a call to do equity is to be heard because a vendee overbid, or guessed wrong, or read the appropriate signs wrong, it should follow that a trustee should ask the bankruptcy court to set aside a sale because, as things emerged later, the vendee made too great a profit. Neither course will do but the trustee can, at least, point to the creditors whose losses might be relieved if more could be garnered in sales of a bankrupt's or debtor's property.

■ Under the principle of commercial frustration, a party responsible for an otherwise lawful contractual obligation is discharged from performance, where that performance, although possible, is rendered undesirable or oppressive because of supervening events. 6 *Corbin on Contracts* § 1322 (1962). This principle is an offshoot of the twentieth century's rejection of a judicial hands-off policy towards contracts. It reflects increased judicial involvement in private contracts. See generally, Speziale, *The Turn of the Twentieth Century as the Dawn of Contract Interpretation*, 17 Duquesne L.R. 555 (1978). It is an affirmation of the reality that there are situations where society's needs are best served by *not* enforcing the performance of senseless contracts.

The principle of commercial frustration, thus, is of comparatively recent development and it focuses on events which materially affect the consideration one party receives for performance. As now understood, at least in law school contract courses, it was applied in *Krell v. Henry*, [1903] 2 K.B. 740 (C.A.), one of the celebrated "coronation cases", which arose out of the illness of King Edward VII on coronation day. There, the court excused the renter of a flat overlooking the procession from paying the balance of the agreed price on the theory that cancellation of the coronation procession excused further performance.

■ From then, a line of cases has evolved *excusing* a party from performance when the motivation for assuming the obligation is foiled. Essentially, the principle of commercial frustration affords a means by which courts allocate risk in order to decide who is to bear the burden of any event not provided for by the parties' agreement. And, although the courts have attempted to outline its components, it actually involves the balancing of interests in light of the facts involved and society's customs and mores. *Murray on Contracts*, § 202 (1974). The basic test is whether the parties contracted on a basic assumption that a particular contingency would not occur. *Murray*, § 202, *supra*. An analysis of the facts is crucial for the proper application of this doctrine. *Krell v. Henry, supra; Farlou Realty Corp. v. Woodsam Assoc. Inc.*, 49 N.Y.S.2d 367 (Special Term 1944), *aff'd*, 249 N.Y. 846, 62 N.E.2d 396 (1945).

With these guiding principles in mind, the court now turns to the law of New York, the governing law as the parties agreed.[15] New York, to a large extent, follows the principle of commercial frustration, as outlined in the Restatement (Second) of Contracts § 285 (Tent. Draft No. 9, April 8, 1974) in these words:

"DISCHARGE BY SUPERVENING FRUSTRATION.

Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary".

See *Strauss v. Long Island Sports, Inc.*, 60 A.D.2d 501, 401 N.Y.S.2d 233 (2d Dept. 1978).

The Restatement breaks this rule down into three inquiries: (1) the purpose that is frustrated must have been a principal purpose of that party in making the contract. Here, there is no doubt that the defendants determined their bids and entered into these contracts in order to take advantage of the restrictive regulatory structure which made it virtually impossible for others to obtain operating rights directly from the ICC. Although the plaintiffs stress that literal performance is still possible, and that the defendants have, in fact, received the operating rights and have and will continue to operate thereunder, the court is not blind to the fact that contracting parties have more significant motivations for doing what they do and in what fashion. See

---

**15.** Paragraph 7(a) of these agreements states that:

"This agreement shall be governed by the laws of the State of New York;"

*Murray on Contracts, supra* ; 6 *Corbin on Contracts*, § 1353 (1962). (2) The frustration must be substantial. This element is to ensure that the defense of commercial frustration will not be accepted in cases where performance has become merely less profitable. To be sure, there is no dispute that the change achieved by the 1980 law substantially lessened the value of the rights purchased. However, the new accessability to others is remote from the major objective of these sales. These contracts involved the purchase and sale of ICC operating rights and defendants, in fact, received the benefits of both a temporary authority to operate and a final authority. These rights are still viable, although the earlier restrictiveness has been extinguished. On a continuum, the profitability associated with restrictive regulations was an objective far removed from the principal purpose of the sale which was to acquire operating rights not otherwise available to these defendants. The lessened profitability occasioned by the 1980 statute is no different than a change in fashion and the impact of such change on the profits of the purchaser of let us say mini or maxi dresses. The final element, (3), is that the non-occurrence of the frustrating event must have been a basic assumption on which the contract was made. This makes the foreseeability of the event a factor in the determination. Generally,

"[T]he continuation of existing market conditions and of the financial situation of the parties are ordinarily not such assumptions, so that mere market shifts or financial inability do not usually effect discharge under the rules stated in this section".

Restatement, Second, *supra* § 281.[16]

It is this third factor, more than any other upon which New York cases have generally focused, *i. e.*, whether or not the supervening event was within the contemplation of the parties and might have been guarded against. *119 Fifth Avenue, Inc. v. Taiyo, supra; Raner v. Goldberg*, 244 N.Y. 438, 155 N.E. 733 (1927); *Frenchman &*

*Sweet, Inc. v. Philco Discount Corp.*, 21 A.D.2d 180, 249 N.Y.S.2d 611 (4th Dept. 1964). A careful reading of the record in these cases discloses that it is this factor that is fatal to defendants' defense.

■ *Raner v. Goldberg, supra*, is the New York case closest on its facts to the instant actions. *Raner* involved a lease of premises to be used as a dance hall. At the time the parties entered into the lease, it was understood that a license was required to operate the premises as a dance hall. The agreement was silent as to the rights and remedies of the parties should the required license be denied. The license was subsequently denied and the lessee brought suit for reimbursement of the rent paid under the lease as well as a return of the deposit. The court refused to release the lessee from its obligation as all the circumstances showed that the parties understood that the procurement of a license, a factor essential to the contemplated use of the premises, rested in the discretion of a public officer, but that the lessee nevertheless made an absolute promise.

"It is clear that a person who makes an absolute promise to pay may not be excused from performance because of the happening of a contingency which destroys the value of the stipulated consideration for such payment where inference is reasonable that an express condition so providing would have been inserted in the contract had the parties so intended. Where the promisor has knowingly chosen to make an absolute promise, he may not afterwards claim relief because subsequent events show that the choice was ill-advised. The test seems to be whether the event … was or might have been guarded against."

*Id.*, at 441, 155 N.E. 733. The parties, aware that the grant or denial of the license was uncertain, could have conditioned performance on its grant. Instead, the lessee chose to assume an absolute obligation, and the court found no basis upon which to relieve the lessee from that obliga-

**16.** Section 285, Discharge by Supervening Frustration, refers back to Section 281, com-

ment b: "Impracticability" for general rules on determining foreseeability.

tion. A person who makes an absolute promise is not to be excused from performance when an event destroys the value of the stipulated consideration and when a reasonable inference may be drawn that an express condition would have been inserted had the parties so intended.

The Contracts Restatement Second, § 285, *supra*, also points to a line of cases with facts similar to those now before this court. Restatement (Second) of Contracts, § 285 (Tent. Draft No. 9, April 8, 1974) Illustration 7 and Comment a. In *Megan v. Updike Grain Corporation*, 94 F.2d 551 (8th Cir. 1938), plaintiff, trustee of the property of the Chicago & North Western Railway Company under Section 77 of the Bankruptcy Act as it then stood, 11 U.S.C. § 205, sought to recover unpaid and accruing rental under a written lease for a grain elevator in Omaha, a public grain market. When the parties had entered into the lease, there were in existence favorable rates and tariffs encouraging the movement of grain products through the Omaha market which made the operation of grain elevators a profitable business. Thereafter, the North Western Railway joined with other railroads in procuring ICC approval of different rates which had the effect of diverting large quantities of grain from the Omaha market. This change rendered the lease nearly worthless to the lessee.

Under these facts, the court concluded that the principle of commercial frustration was inapplicable, noting that nothing in the agreement linked the viability of the lease to the continued existence of favorable rates and tariffs. Additionally, the court observed that these changes were in no way unanticipated as railroad rates and tariffs always remain subject to regulation by the ICC. Moreover, these changes were found to have followed lengthy inves-

tigation and public hearing.[17] These factors support this court's conclusion that the principle of commercial frustration is inapposite to the facts here. Under the facts here it cannot be said that the supervening event was not contemplated by the parties. 6 *Corbin on Contracts* § 1355 (1962).

Here, the defendants made their agreements knowing full well that the value of the rights they bought depended on an unchanged regulatory structure, but one that always was and remained subject to change. Although these buyers bargained on the benefits they would derive from limited competition, the contracts of sale were silent as to the omnipresent possibility of adverse change.

It can hardly be refuted that at the time M&M's operating rights were sold to Schuster, there was national focus on the proposed changes in the trucking industry. In the case of Drake's rights, the possibility of deregulation was openly discussed by those attending the sale. In both cases, deregulation, in some form, in some measure, and at some time, was a not impossible eventuality.

No one could claim ignorance of the fact that the very nature of these operating rights and the involvement of government in their structure played a part in their value. These defendants are knowledgeable businessmen, not only in appraising the value of their purchase and therefore their bidding price in a bankruptcy sale, but also in the inherent nature of their business. They were surely aware that theirs is a business subject to governmental approval and regulation. With all this in mind and without more, it is only fair that the risk of change should be placed on the purchasers.

---

17. *Accord, Essex-Lincoln Garage, Inc. v. City of Boston*, 342 Mass. 719, 175 N.E.2d 466, (Mass.1961), which was an action by the lessee of public parking facility for rescission of lease after a change in traffic regulations made continued operation less profitable. The court held that the lessee assumed the risk that the City, the lessor, might change the regulations, as it is well known traffic regulations are sub-

ject to change. In *Didonato v. Reliance Standard Life Insurance Co.*, 433 Pa. 221, 249 A.2d 327 (Pa.1969), purchasers of real estate sued for rescission because of the adverse impact of a subsequent zoning change. The court held that risk of such change, in the absence of some expression to the contrary, is to be allocated to the purchaser.

Although defendants argue against the foreseeability of deregulation, the facts belie the premise. The affidavit submitted by Paul Schuster in opposition to the summary judgment motion by M&M in relevant part says:

"In June 1977, and for years previously thereto, the undersigned is aware that there had been discussions in Congress about the possibility of some changes in the Interstate Commerce Act, but these discussions had never materialized into any concrete proposal with any realistic prospect of adoption by Congress, and many of the proposals given the most serious consideration did not contemplate the substantial elimination of the limited entry into the marketplace which had always been incident to ICC operating rights."

This affidavit demonstrates ample knowledge of the possibility of deregulation. That defendants chose to disbelieve or to dismiss the possibility as a serious threat was a personal assessment. That defendants bid as they did with knowledge of a potential deregulation was a matter of their business judgment. For all that appears their bids might have been pitched not only to the possibility of diminished profits but to the judgment that their expectations would measure up to their investment even if deregulation, in fact, were to come. Given the possibilities, these defendants could have insisted that if deregulation were to come within a set period, the sales would be nullified. They chose not to and the court must assume this is how they would have it. Surely the contracts they did enter into could have dealt with deregulation. In those portions of the contracts dealing with ICC approval of the transfers, provision is made for modification or termination of the agreements if the ICC were to either materially change or deny the rights.[18]

Here, there is no escape for these defendants, and it is reasonable to leave them where their agreements place them.

18. See Paragraph 3(c) of the Drake Agreements and Paragraph 3(c) and 3(d) of the M&M Agreement.

The only condition upon performance was final ICC approval. The agreements and this court's orders are clear as to this. The parties should not be excused from what has become a bad bargain under the principle of commercial frustration. Here, the only frustration is the defendants' in that known risks they assumed have turned out to their disadvantage. This is a case where provision could have been made for what actually occurred. Commercial frustration is no defense where no unusual or unforeseeable event prevented performance and where provision could readily have been made for what actually occurred. *Frenchman & Sweet, Inc. v. Philco, supra.* Deregulation was not an event, the non-occurrence of which was the basis for the bargain. The risk of change in the regulatory framework of the trucking industry was assumed by defendants, and they cannot now be released from valid legal obligations.

V.

Each plaintiff is entitled to the grant of summary judgment for the relief sought by the complaints and to the dismissal of defenses and counterclaims interposed by the defendants. Settle a separate order in each case on five days notice.