# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

FILED

July 15, 1998

Cecil W. Crowson
Appellate Court Clerk

LARRY G. TRAIL,                          )
                                         )
    Plaintiff/Appellee,                  )
                                         )
VS.                                      )     Rutherford Chancery
                                         )     No. 94CV-954
TRANSPORTATION MANAGEMENT                )
SERVICES,                                )
                                         )
    Defendant/Appellee,                  )
                                         )     Appeal No.
AND                                      )     01A01-9607-CH-00314
                                         )
SKYLINE TRANSPORTATION, INC.,            )
                                         )
    Defendant/Appellant.                 )

APPEAL FROM THE CHANCERY COURT
FOR RUTHERFORD COUNTY
AT MURFREESBORO, TENNESSEE

THE HONORABLE ROBERT E. CORLEW, III, CHANCELLOR

For Transportation Management Services:

Roland M. Lowell
Bruce, Weathers, Corley, Dughman & Lyle
Nashville, Tennessee

For Skyline Transportation, Inc.:

Linda J. Hamilton Mowles
Lewis, King, Krieg, Waldrop & Catron
Knoxville, Tennessee

## AFFIRMED AND REMANDED

WILLIAM C. KOCH, JR., JUDGE

# O P I N I O N

This appeal involves a dispute between two trucking companies over the enforceability of a contract to sell intrastate operating rights along specified routes in Middle and East Tennessee. The purchaser declined to honor the contract when it became worthless as a result of federal deregulation of intrastate commercial trucking. In an interpleader action filed in the Chancery Court for Rutherford County, the seller asserted that the purchaser breached the contract, and the purchaser asserted that the contract permitted it to cancel in the event of deregulation. The trial court granted the seller's motion for summary judgment after determining that the purchaser did not have the right to cancel the contract because the federal deregulation occurred after the contract's consummation date. The purchaser asserts on this appeal that it is entitled to relief from its contractual obligation because the contract was essentially worthless. We have determined that the contract remains enforceable and, therefore, affirm the trial court.

## I.

Skyline Transportation, Inc. and Transportation Management Services, Inc. are trucking companies operating in Tennessee. Skyline desired to purchase several of Transportation Management's routes in Middle and East Tennessee, and on December 27, 1993, the two companies entered into a contract wherein Skyline agreed to acquire the rights for $80,000. At the time of this transaction, the sale and transfer of operating authority from one trucking company to another required approval by both federal and state regulators. Accordingly, the parties agreed that Skyline would place $8,000 in escrow when the contract was executed and would pay the remaining balance after the appropriate state and federal regulatory authorities approved the sale.

Both companies were aware of discussions on the national level to deregulate the intrastate trucking business and understood that trucking companies would not be required to obtain state regulatory approval to operate on intrastate routes if these efforts were successful. Recognizing that deregulation would render their contract worthless, the parties included the following provision in their contract:

> The operating rights comtemplated [sic] herein shall be transferred by SELLER to PURCHASER no later than the consumation [sic] date, by all necessary documents which the parties hereby agree to execute, including but not limited to a bill of sale, and subject to conditions set out herein, which documents shall confer on PURCHASER good and merchantable title to all of said operating rights free and clear of any and all liens, claims and encumberances [sic] of any kind whatever. Should any pre-emptive action by the federal government or should the State of Tennessee, no longer require operating authority for intrastate motor carrier transportation, prior to the consummation date hereof, then PURCHASER shall have the option of terminating and canceling this Agreement and having all monies held in trust or escrow returned to it forthwith.

The contract expressly defined the "consummation date" as "a date falling after the effective date of the final grant orders of the ICC approving this transaction, and falling within the time permitted by the final grant orders to consummate this transaction provided therein, and upon order of the Tennessee Public Service Commission recognizing transfer of ownership of the certificates."

On April 22, 1994, the Interstate Commerce Commission ("ICC") granted Skyline temporary operating authority to lease the rights covered by its contract with Transportation Management. On June 3, 1994, the ICC published a notice that it had approved the complete transfer of the operating rights from Transportation Management to Skyline. When this approval became final on August 3, 1994, the ICC notified the parties that it would issue the operating authority in Skyline's name when the parties submitted a jointly signed notice of consummation. On August 8, 1994, the Tennessee Public Service Commission ("PSC") entered an order directing that its records be amended to reflect the transfer of Transportation Management's intrastate certificates to Skyline in order "to conform this agency's records to federal law."

While Skyline and Transportation Management were seeking federal and state regulatory approval for the transfer of Transportation Management's authority to Skyline, legislation deregulating intrastate transportation of property was winding its way through the Congress. In October 1993, the House of Representatives passed the Aviation Infrastructure Act of 1993 that contained no provisions preempting state regulation of intrastate trucking. However, in June 1994, the Senate replaced the

House bill with the Federal Aviation Authorization Act of 1994 that included a provision preempting state regulation of intrastate trucking.[1] On August 5, 1994, a conference committee approved the Federal Aviation Authorization Act of 1994 with modifications and recommended it for passage.[2] On August 8, 1994, the House of Representatives and the Senate agreed to the conference committee report containing the preemption provision.[3] The President approved the legislation on August 23, 1994,[4] and it became effective according to its own terms on January 1, 1995.[5] The preemption provision in the Federal Aviation Authorization Act of 1994 rendered Transportation Management's certificates of convenience and necessity for the intrastate routes desired by Skyline essentially worthless.[6]

Some time during the second week of August 1994, Skyline learned that the House of Representatives and the Senate had passed the Federal Aviation Administration Authorization Act of 1994 containing the preemption provision. On August 18, 1994, Transportation Management forwarded the notice of confirmation required by the ICC to Skyline for its signature. On August 22, 1994, Skyline

---

[1]According to some contemporary accounts, Congress had debated ending state regulation of trucking as far back as early 1992. *See What do Sears, Nader, Frito-Lay, and Bush Have In Common?*, Business Week, April 6, 1992, at 30. The preemption language was included in a rider placed on a multi-billion dollar airport funding bill in June 1994. *See Cheap Truckin'*, National Review, Nov. 7, 1994, at 54.

[2]*See* H.R. Conf. Rep. No. 103-677 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1715.

[3]*See* 49 U.S.C.A. § 14501(c) (West 1997). The federal statute contains several specific exceptions to the restriction of state regulation, none of which are applicable here.

[4]*See* Statement by President William J. Clinton Upon Signing H.R. 2739, *reprinted in* 1994 U.S.C.C.A.N. 1762-1.

[5]*See* Federal Aviation Administration Authorization Act of 1994, Pub. L. No. 103-305, § 601(d), 108 Stat. 1607 (1994).

[6]The Congress recognized that the preemption provision would devalue existing certificates of convenience and necessity. The conference committee's report states:

> During the hearing on preemption of State regulation held by the House Committee on Public Works and Transportation on July 20, 1994, concerns were raised regarding the devaluation of operating rights and its effect on motor carriers, as a result of preemption of State authority to regulate the price, route, or service for intrastate transportation. Some motor carriers have purchased or paid to acquire the authority to operate trucks in many States. These operating rights for many motor carriers, especially small carriers, are an important part of their net business assets. The conferees recognize that this will eliminate the asset value of the operating authority of those affected motor carriers.

H.R. Conf. Rep. No. 103-677, at 88-89 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1715, 1760-61.

informed Transportation Management that it declined to execute the notice of consummation and that it was exercising its right to cancel the contract.

On August 25, 1994, the attorney holding Skyline's initial escrowed payment filed an interpleader action in the Chancery Court for Rutherford County requesting a determination of the parties rights and obligations to the money being held in escrow. Transportation Management and Skyline answered the complaint and joined issue on whether Skyline had breached the contract by declining to execute the notice of consummation and by declining to pay Transportation Management the remaining balance due under the contract. Both parties eventually filed motions for summary judgment. On January 31, 1996, the trial court granted Transportation Management's summary judgment motion, finding that Skyline could not cancel the contract because the federal legislation became effective after the contract's self-defined consummation date. Skyline then perfected this appeal.

## II.

The essence of Skyline's position in this case is not difficult to grasp. It signed a contract to purchase the rights to operate over routes owned by Transportation Management and agreed to pay a price for these rights commensurate with its estimation of their value at the time. Before Skyline paid the agreed price, the rights it purchased lost their value through no fault of either Skyline or Transportation Management. Skyline now does not desire to pay $80,000 for operating rights that are available to it at no cost and argues that "[e]quity should acknowledge the propriety of relieving [it] . . . from any obligation to pay eighty thousand dollars for a transfer of something which has absolutely no value . . .."

It is important to recognize from the outset that this is not a case of commercial frustration. Ever since the destruction of the dance hall involved in the case of *Taylor v. Caldwell*, 122 Eng. Rep. 309 (K.B. 1863), the law has recognized that a party's performance under a contract may be excused, when, through neither party's fault, the contract's principle purpose has been totally thwarted. In modern parlance, the doctrine of commercial frustration excuses a promisor from performing when the promisor can show (1) that the risk of the frustrating event was neither foreseen nor

caused by the parties and (2) that the frustrating event has destroyed or nearly destroyed either the value of the performance or the object or purpose of the contract. *See Williams v. Whitehead*, 854 S.W.2d 895, 897 (Tenn. Ct. App. 1993); *Haun v. King*, 690 S.W.2d 869, 871 (Tenn. Ct. App. 1984); Restatement (Second) of Contracts § 265 (1981). The doctrine affords a means by which courts allocate a risk when the parties have not anticipated or allocated the risk in their agreement. *See In re M & M Transp. Co.*, 13 B.R. 861, 869-70 (Bankr. S.D.N.Y. 1981).

The frustrating event in this case is the deregulation of the intrastate trucking business. Both Skyline and Transportation Management were cognizant that state or federal regulators might "no longer require operating authority for intrastate motor carrier transportation" and included in their agreement a specific provision allocating the risk that deregulation might occur. The fact that they were both aware of the possibility of deregulation places this case beyond the commercial frustration doctrine. The parties are not entitled to risk allocation by operation of law when they have allocated the very same risk for themselves. Accordingly, our task in this case is to ascertain and give effect to the parties' risk allocation as reflected in their contract.

## III.

The parties took the possibility of deregulation into account during their negotiations. Transportation Management initially proposed to give Skyline the right to cancel the contract if the State ceased requiring operating authority for intrastate routes before the contract's consummation date but later agreed to Skyline's proposal to extend the right of cancellation to circumstances where the federal government preempted state regulation of motor carriers before the contract's consummation date. Accordingly, we must look to the contract to answer the following three outcome determinative questions: (1) when did the contract's consummation date occur, (2) when did the federal government preempt state regulation of intrastate motor carriers or when did the State cease requiring operating authority for intrastate routes, and (3) did the federal government preempt state regulation of intrastate motor carriers or did the State cease requiring operating authority for intrastate routes before the contract's consummation date.

## A.

Contracting parties are free to allocate risks as they see fit. *See Wilson v. Tennessee Farmers Mut. Ins. Co.*, 219 Tenn. 560, 566, 411 S.W.2d 699, 702 (1966); *Brown Bros., Inc. v. Metropolitan Gov't*, 877 S.W.2d 745, 749 (Tenn. Ct. App. 1993). When they have reduced their agreement to writing, their rights and obligations are governed by their written contract. *See Cookeville Gynecology & Obstetrics, P.C. v. Southeastern Data Sys., Inc.*, 884 S.W.2d 458, 461 (Tenn. Ct. App. 1994). Courts do not concern themselves with the wisdom or folly of contracts, *see Chapman Drug Co. v. Chapman*, 207 Tenn. 502, 516, 341 S.W.2d 392, 398 (1960); *Brooks v. Networks of Chattanooga, Inc.*, 946 S.W.2d 321, 324 (Tenn. Ct. App. 1996), and are not at liberty to relieve parties from obligations that later prove to be burdensome or unwise. *See Hillsboro Plaza Enters. v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993).

Courts must interpret contracts as written. *See Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975). We review the contract as a whole. *See Warren v. Metropolitan Gov't*, 955 S.W.2d 618, 623 (Tenn. Ct. App. 1997); *Wilson v. Moore*, 929 S.W.2d 367, 373 (Tenn. Ct. App. 1996). We must also give a contract's language its plain, natural, and ordinary meaning, *see Hardeman County Bank v. Stallings*, 917 S.W.2d 695, 699 (Tenn. Ct. App. 1995); *Gredig v. Tennessee Farmers Mut. Ins. Co.*, 891 S.W.2d 909, 912 (Tenn. Ct. App. 1994), and must avoid strained interpretations that create ambiguities where none exist. *See Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975); *Empress Health and Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188, 190-91 (Tenn. 1973).

## B.

The two dates material to the resolution of this dispute are the contract's "consummation date" and the date of the federal government's "pre-emptive action." The contract does not identify a specific consummation date but rather states that the "consummation date" must (1) follow the effective date of the ICC's final order

approving the transaction, (2) occur during the time period permitted by the ICC's order, and (3) be "upon the order of the Tennessee Public Service Commission recognizing transfer of ownership of the certificates." The consummation date is not the same as the closing date because the contract states that conducting a closing is optional.

The phrase "upon the order of the Tennessee Public Service Commission recognizing transfer of ownership of the certificates" supplies the clearest indication of the parties' intentions. When introducing a condition or event, the preposition "upon" usually connotes "on the occasion of" or "at the time of" with little or no interval thereafter. *See* Webster's Third New International Dictionary 2518 (1971); Bryan A. Garner, *A Dictionary of Modern Legal Usage* 904 (2d ed. 1995). Accordingly, as we construe the contract, its consummation date is the date on which the transaction receives final regulatory approval from the PSC. This interpretation is consistent with the parties' understanding that the transfer of the routes could not take effect until they obtained both federal and state regulatory approval.

The ICC's order became final on August 3, 1994. It did not contain a specific time period for consummating the transaction.[7] Thereafter, on August 8, 1994, the PSC "recognized" the ICC's final order. The PSC's order represented the last regulatory hurdle for the parties' transaction, and therefore, the contract's consummation date fell on August 8, 1994.

The final date to be determined is the date that the federal government took "pre-emptive action." Under the Supremacy Clause in U.S. Const. art. VI, cl. 2, preemption occurs when there is an actual conflict between federal and state law, *see Freightliner Corp. v. Myrick*, 514 U.S. 280, 287, 115 S. Ct. 1483, 1487 (1995), or when Congress's legislation is so pervasive that it leaves no room for state legislative action. *See Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S. Ct. 2608, 2617 (1992). Congressional intent to preempt state law must be reflected in the text and structure of the federal statute, *see Ingersoll-Rand Co. v. McClendon*, 498 U.S.

---

[7]The ICC's letter notifying the parties that its June 3, 1994 notice of approval had become final stated only that "[b]efore the involved authority can be issued in the new owners [sic] name, a Notice of Consummation signed by both parties must be filed with the Commission. This notice should be in letter form and must include the signatures of both parties." The ICC did not establish a deadline for filing this letter.

133, 138, 111 S. Ct. 478, 482 (1990), and the best evidence of preemptive intent is an express preemption clause. *See CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664, 113 S. Ct. 1732, 1737 (1993).

The Federal Aviation Administration Authorization Act of 1994 contains an explicit provision preempting state or local regulation of intrastate motor carriers with respect to the transportation of property.[8] *See* 49 U.S.C.A. § 14501(c)(1) (West 1997). Accordingly, the "federal pre-emptive action" could have occurred no earlier than the enactment of the Federal Aviation Administration Authorization Act of 1994. Since the federal lawmaking power is shared by both houses of Congress and the President,[9] *see I.N.S. v. Chadha*, 462 U.S. 919, 947, 103 S. Ct. 2764, 2782 (1983), the earliest date that "federal pre-emptive action" could have occurred would have been August 23, 1994, when the President signed the legislation.[10]

Skyline did not have a right to cancel its contract with Transportation Management because the contract's consummation date occurred fifteen days before the date of the "federal pre-emptive action." Accordingly, Skyline breached the contract by declining to sign the notice of consummation and by refusing to pay Transportation Management the remaining balance of the contract.

## IV.

We affirm the judgment and remand the case to the trial court for whatever further proceedings consistent with this opinion may be required. We tax the costs of this appeal to Skyline Transportation, Inc. and its surety for which execution, if necessary, may issue.

---

[8]The statute contains several exceptions to the general preemptive rule which are not applicable to this case.

[9]U.S. Const. art. 1, § 1, vests the federal government's law-making power in the Congress. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 588-89, 72 S. Ct. 863, 867 (1952). However, the laws passed by Congress cannot take effect until they have been presented to the President under the Presentment Clause in U.S. Const. art. I, § 7, cl. 2. Legislation that has not been passed by both houses of Congress and presented to the President cannot become law. *See Clinton v. City of New York*, ___ U.S. ___, ___, 1998 WL 333013, at *14 (U.S. June 25, 1998); *I.N.S. v. Chadha*, 462 U.S. at 957-58, 103 S. Ct. at 2787.

[10]An argument can be made that the "federal pre-emptive action" did not occur until January 1, 1995 when 49 U.S.C.A. § 14501(c) became effective. This case does not require us to choose between August 23, 1994 and January 1, 1995 because both dates occur after the consummation date of the parties' contract.

_____

WILLIAM C. KOCH, JR., JUDGE

CONCUR:


_____

SAMUEL L. LEWIS, JUDGE


_____

BEN H. CANTRELL, JUDGE