**PROFILE PUBLISHING AND MAN-
AGEMENT CORPORATION
APS, Plaintiff,**

v.

**MUSICMAKER.COM, INC., Defendant.**

**No. 01 CIV. 2886(RO).**

United States District Court,
S.D. New York.

Jan. 23, 2003.

Beldock Levine & Hoffman LLP, New York City, Ronald C. Minkoff, Peter A. Perlman, for Plaintiffs.

Ré, Parser & Partners, New York City, Stuart A. Jackson, for Defendants.

*OPINION AND ORDER*

OWEN, District Judge.

Plaintiff Profile Publishing and Management Corporation APS (Profile) moves for: (1) summary judgment pursuant to Fed. R.Civ.P. 56(a) for the balance due on a music licensing contract; (2) an Order dismissing Defendant Musicmaker.com, Inc.'s (Musicmaker) counterclaims and affirmative defenses; and (3) an Order imposing sanctions on Musicmaker pursuant to Fed. R.Civ.P. 11(c). Musicmaker cross-moves for leave to amend its answer and counterclaims pursuant to Fed R. Civ P. 15(a) to assert the defense of frustration of purpose.

Profile is a Danish corporation that owns the publishing and distribution rights to a significant portion of the musical recordings by the musical group The Who. Musicmaker is a Delaware corporation that owned and operated an internet web site which provided to consumers custom disc compilation services which allowed customers to either create and purchase

digital musical recordings on compact discs or to pay to download music from Musicmaker's catalog of licensed recordings.

Profile and Musicmaker entered into a contract on December 28, 1999 whereby Profile licensed Musicmaker to use several live recordings by The Who, the agreement giving Musicmaker the exclusive right to sell copies of these recordings worldwide over the internet for a ten year term, and the non-exclusive right to broadcast and/or publicly perform them for that period. Profile retained the right to release recordings of this material through normal retail channels. The agreement called for Musicmaker to pay Profile a percentage of the sale price for each sale, and to pay an advance against royalties of $2,500,000—$1,500,000 upon receipt of the Master recording, and four quarterly payments thereafter in the amount of $250,000 each. Musicmaker received the master recording on February 28, 2000, began selling the recordings over its website, and made the first four required payments on time. In January 2001, Musicmaker shut down its web site and announced plans to liquidate the company. Musicmaker then failed to make the final $250,000 payment which was due on February 28, 2001 and is the subject of this action.

Some seven or eight months before the parties here entered into their contract, in May 1999, Napster.com came into existence. It was a peer-to-peer file sharing website that had the effect of making copyrighted music available for free to anyone on the internet. However, it was but one of many thousands of internet sites offering music for free. Two months before the contract was signed here, contained in an October 28, 1999 internet printout, puzzlingly put before me by Musicmaker, the trade was being told internationally:

> The following press release issued today by the International Federation of the Phonographic Industry (IFPI), announces a global attack on music piracy with special attention to individuals and companies uploading illegal MP3 files and Internet service providers hosting illegal MP3 sites.

> * * * * * *

> Fighting Internet piracy involves targeting two groups— people who are uploading infringing material on to the internet— commonly in the MP3 format— to be downloaded for free . . . .

> * * * * * *

> IFPI launched a global structure two years ago to fight the proliferation of CD piracy, now worth $4.5 billion annually. The new global strategy to fight Internet piracy reflects the recording industry's concern over spreading online piracy in the next few years.

> * * * * * *

> MUSIC ON THE INTERNET—KEY FACTS

> * * * * * *

> It is estimated that 1 million illegal music files are posted on the Internet— yet few countries outside the USA have adequate legislation to fight Internet piracy . . . .

Exhibit B to the affidavit of Stuart Jackson, March 30, 2001.

Three weeks before the contract was signed here, on December 6, 1999, the Recording Industry Association of America (RIAA), a trade group that represents the U.S. recording industry, filed a highly publicized suit against Napster for copyright infringement. The RIAA suit received widespread coverage in the press, including the front page of Billboard magazine, the trade newspaper for the music industry, in its December 18, 1999 issue.

In April 2001, Profile filed this action, and then filed an amended complaint in

June 2001. Musicmaker responded with eight affirmative defenses and nine counterclaims. In October 2001, Profile moved for summary judgment and for Rule 11 sanctions. In November 2001, Musicmaker requested leave of the court to withdraw all of its previously pleaded affirmative defenses and counterclaims and to interpose but one affirmative defense and counterclaim alleging frustration of purpose.

Profile contends that Musicmaker's proposed defense of frustration of purpose lacks merit and that the amendment would, therefore, be futile. "[W]here, as here, the cross-motion is made in response to a Fed.R.Civ.P. 56 motion for summary judgment, and the parties have fully briefed the issue whether the proposed amended complaint could raise a genuine issue of fact ... the court may deny the amendment as futile when the evidence in support of the ... proposed new claim creates no triable issue of fact." *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir.2001).

Frustration of purpose arises when "[b]oth parties can perform but, as a result of unforeseeable events, performance by party X would no longer give party Y what induced him to make the bargain in the first place. Thus frustrated, Y may rescind the contract." *United States v. Gen. Douglas MacArthur Sr. Vil., Inc.*, 508 F.2d 377, 381 (2d Cir.1974). "The basic test is whether the parties contracted on a basic assumption that a particular contingency would not occur.... An analysis of the facts is crucial for the proper application of this doctrine." *M&M Transp. Co. v. Schuster Express, Inc.*, 13 B.R. 861, 869 (S.D.N.Y.1981).

Musicmaker claims that it entered into the exclusive license to acquire the sole rights to exploit certain live performances of The Who through its custom-disc compilation service, and to capture income by being the only place consumers who prefer to pick and choose the songs they desire could go for these recordings. It claims that this exclusivity was key to the contract and was the reason it was willing to pay the amount it paid for those rights. Musicmaker further claims that this purpose was frustrated and the rights granted to it were rendered utterly worthless by the advent of file-sharing services such as Napster, which made recordings of the live performances they contracted for available on the internet free of charge. While Musicmaker admits that it was aware of the existence of Napster prior to signing the contract, it claims that neither Musicmaker nor "even the most experienced players in the [music] industry" were aware of the "cataclysmic" effect it would have. Thus, Musicmaker concludes, the effect of Napster and its ilk was wholly unforeseeable, and that under the doctrine of frustration of purpose they should be allowed to rescind the contract.

■ Profile counters that the possible effect of Napster was foreseeable at the time the contract was signed on December 28, 1999. Profile observes that not only does Musicmaker admit it was aware of Napster prior to signing the contract, but in 1999, knowledge about Napster and similar services was pervasive in the music industry, and that the RIAA, a trade group that represents the U.S. recording industry, filed a highly publicized suit against Napster—then seven months old—for its blatant widespread copyright infringement three weeks before Musicmaker signed the contract here. So, while it is obvious that Napster did make a mess of a lot of things, so do many events in unpredictable life, perhaps only partially perceived at the time, or even unperceived. That, however, does not a legal frustration of purpose make, and while one can have a sympathetic emotional tug here, a contract

is a contract, and Profile has stood ready to perform.

For the above reasons, Musicmaker's motion for leave to amend its answer is denied and I grant Profile's motion for summary judgment for the last unpaid installment on its contract as stated, it has stood ready to perform and Musicmaker's defense to its performance is legally inadequate.

Profile also moves for sanctions under Fed.R.Civ.P Rule 11(b)(3) which provides:

> By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

The rule is here demonstrably applicable. The original answer to the complaint filed by Musicmaker on June 29, 2001, contained eight affirmative defenses and 3 counterclaims and claims for punitive damages. These claims, a few extensively stated, many but conclusorily stated in one or two sentences, were, as categorized in the complaint: Failure to state a claim; Breach; Waiver; Estoppel; Fraud; Failure of consideration; Setoff; Modification; Breach of covenant; Breach of the implied covenant of good faith and fair dealing; Intentional misrepresentation; Negligent misrepresentation; Recission; Conversion; Accounting; Declaratory relief; Constructive trust; and punitive damages. Some were "on information and belief," some were not. The plaintiff's lawyers quickly communicated to defendant's counsel that all the defenses and counterclaims were baseless and should be withdrawn, calling them to their office for an informal meeting. They sent a detailed followup letter on July 17, and brought it up in a Court conference. They served, but did not file, a Rule 11 motion. Nevertheless, Musicmaker waited a number of months until Profile had made, served and filed an extensive summary judgment motion, whereupon it withdrew every one of its affirmative defenses and counterclaims, and moved for leave to assert the single defense of "Frustration of Purpose," which has been denied earlier in this opinion.

In opposition to plaintiff's motions for sanctions, defendant's counsel contends that Musicmaker ceased to do business on January 3, 2002, so that by the time plaintiff filed the complaint there was no one left at Musicmaker to whom counsel "could have resorted for information concerning allegations in the complaint." Musicmaker's counsel also asserts that "those employees he did manage to find were without knowledge of facts and not willing to cooperate with counsel in mounting a defense." Musicmakers's memorandum thereupon states that "counsel had little to go on other than research conducted on the Internet which formed the basis of pleadings and counterclaims and cross claims pleaded in Musicmaker's answers."

That use of the Internet was the sole basis for the affirmative defenses and counterclaims is confirmed by an affidavit put in by attorney Jane Osborne McKnight, executed on January 23, 2002, in which she, apparently Musicmaker's sole researcher, acknowledged

> My factual investigation was necessarily restricted to searching scores of Internet websites for information about the materials licenses, the tour, the individual artists (like Peter Townshend, Roger Daltry, and John Entwistle) and related subjects. I also systematically searched

major national and regional newspapers and wire service articles (on the proprietary NEXIS database) concerning the same matters.

Ms. McKnight annexes all sorts of Internet printouts most of which have no relevance to the numerous claims eventually made in the answer based on her work. One that would appear to have some relevance is Exhibit 20, which reads: "The World premier of this 2 hour internet/radio special was webcast on April 13 through SFX.com. Viewable with Quick Time (or Media Player) at SFX.com's website: *The Who Live on Line* [Special was still available as of Oct 08th]." From the use of the word "webcast" in the Internet printout above Ms. McKnight asserts that these "Fan sites for The Who *seemed to indicate* that the archived concert tracks were available for digital download for nearly one year." (emphasis added)

But "webcast" and "digital downloading" are not the same. In any event, I note this claim's withdrawal by Musicmaker following plaintiff's filing for summary judgment. A webcast, the Court understands, is "broadcasting" such as over the radio and while a recording can be made therefrom, it has flaws of transmission, whereas digital downloading is the ability to obtain an identical duplicate of the master which thus has resale value equivalent to the master. I note that this difference in these two terms had earlier been set forth by an affidavit of Donald Maggi submitted by Profile. It does not appear that Ms. McKnight considered the papers theretofore filed and so was not aware of this and in her second affidavit, Ms. McKnight is erroneously adamant without record support that webcasting permits "digital download to the public at large," which it does not.

Other claims she suggested, such as the initial delivery of certain masters of poor quality, Musicmaker acknowledges were solved *at the time* by remastering. Ms. McKnight as much acknowledges this rebuttal in her reply affidavit, off-handedly stating that, "the fact that tracks were remixed or that the remixed tracks were made available for sale by Musicmaker is not dispositive of their quality." As to certain promotional tour opportunities, the claim Musicmaker asserted was that this was to happen without additional consideration. But there is no support in the record for this to be without further consideration, and there is no question it did come to pass. Musicmaker did become a tour partner.

■ Finally, coming full circle, is the fact that notwithstanding Ms. McKnight's use of Internet, when plaintiff was finally forced to make a summary judgment motion, Musicmaker faced with this in fact withdrew all the defenses and counterclaims. Accordingly, I conclude that Rule 11 has been violated here in that the said affirmative defenses and counterclaims were asserted without the reasonable inquiry required under the circumstances. Accordingly, counsel should have withdrawn them early on when plaintiff urged this, not forcing plaintiff to prepare and move for summary judgment which finally caused their evaporation.

Accordingly, I move to award plaintiff Rule 11 sanctions, to be assessed against Musicmaker and its attorneys for the attorney fees for the summary judgment motion which Musicmaker did not oppose. Plaintiff is to present to the Court by February 18, 2003 a sufficiently detailed schedule and basis for fees claimed. Should an issue be raised to any of this, I will schedule a hearing thereon.

So ordered.