# MANSON *v.* DUNCANSON.

APPEAL FROM THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 127. Argued January 8, 11, 1897. — Decided April 19, 1897.

In the District of Columbia a non-resident minor, having an interest in real estate situated therein, may, by the appointment of a guardian *ad litem* by the proper court, and without service of personal process upon him, be subjected to a decree providing for the sale of the land for the payment of the debts of the decedent owner, and partitioning the surplus, if any, after such payment.

Such a decree, if made by a court with full jurisdiction of the subject-matter and having the proper parties before it, cannot be attacked by one of those parties in a collateral proceeding.

Whether the decedent owner in such case had any interest in the land petitioned to be sold was a question to be decided by the court in which the cause was pending, and if error was committed in its disposition of that question, the remedy was by appeal, or by a bill of review, if duly filed.

In condemnation proceedings instituted by the United States in the Supreme Court of the District of Columbia to obtain land for a post office site in the city of Washington, a treasury draft for the sum of $17,000 was paid by the United States into the registry of that court on October 9, 1891, as compensation to the owner of a parcel of land designated in the proceedings as parcel 15, in square 323. Frederick L. Manson and Charles C. Duncanson both claimed this fund, each as having been owner in fee simple of the said parcel 15 at the time of the condemnation, and on June 20, 1892, Manson filed his bill in equity in the said court against Duncanson, seeking to enjoin the defendant from receiving the fund, and asking for an order directing payment of the same to the complainant. The facts presented by the case which arose upon this bill are substantially as follows:

On August 2, 1862, James W. Barker, who then owned a part of lot 6 in the said square, which part included the land designated in the said proceedings as parcel 15, executed a deed, wherein his wife joined, conveying the property to

William R. Woodward, in trust. William L. Manson and Sarah Jane Manson, his wife, united with Barker and wife in the execution of this deed, and it was recited therein that Sarah Jane Manson was possessed of property separate from her husband, which she was desirous of having invested in the said premises, and that therefore William L. Manson, with her consent and concurrence, had entered into a contract with Barker for the purchase of the same, and for the purchase price thereof was to pay a certain amount in cash and give certain notes, the amount of one of which was to discharge a purchase money debt due by Barker. It was further recited that all of the notes had been executed by Manson and wife, and delivered. The deed provided that Woodward should hold in trust to secure the payment of the notes, and, until there should be some default in payment of the same, to permit Sarah Jane Manson to occupy and enjoy the premises, and receive the rents thereof for her separate use; and upon the full payment of all the notes, to make conveyance of the property upon the trusts and for the purposes expressed and declared for the benefit of Sarah Jane Manson in and by a certain other deed or declaration, bearing even date with the conveyance described.

The deed or declaration referred to was executed by Manson and his wife, and described the said Woodward and Erastus Poulson as parties thereto of the second and third part, respectively. It directed that, after payment of the notes, etc., Woodward should convey the premises to Poulson, who should thenceforth stand seized of the same upon the trusts following, viz.:

"In trust for the said Sarah Jane Manson for and during her life, and to permit her to occupy said premises and to receive the rents and profits thereof for her own sole and separate use, free from the interference of her present or any future husband, and without being liable for his debts or engagements, her receipt alone being a valid discharge for such rents and profits.

"And upon further trust that it shall be lawful for the said Sarah Jane Manson at any time, and from time to time dur-

ing her life, to dispose of the said premises, either by absolute sale or mortgage thereof, as she may think proper, in which the said party hereto of the third part, his heirs and assigns, shall join, such disposition to be made by deed or deeds to be executed and acknowledged by the said trustees, and by the said Sarah Jane Manson as if she were sole and unmarried. And in default of any such sale or mortgage, or so far as the same shall not extend, upon further trust for such person or persons and for such estate, and in such parts, shares and proportions as she, the said Sarah Jane Manson, shall or may, from time to time by any deed or instrument of writing, or by her last will and testament, under her hand and seal (and which she is hereby authorized to make), limit, direct or appoint, give or devise the same; and in default of any such limitation, direction and appointment, gift or devise, in trust for such child or children as she shall leave surviving her, and the issue of any deceased child or children equally share and share alike, such issue taking his, her or their parent's or parents' share; and for default of all such children or issue, then in trust for the right heirs of the said Sarah Jane Manson forever. And it is further declared that all moneys which shall or may be raised by sale or mortgage of the said premises, or any part thereof, shall be paid to the said Sarah Jane Manson, and be disposed of as she shall or may think best, her receipt being a valid discharge therefor; and the party paying the same not being bound to see to the application or disposition thereof."

On August 2, 1865, all of the notes then having been paid, Barker and Woodward, by deed of that date, released and conveyed the property to Poulson, in trust for the sole and separate use and benefit of Sarah Jane Manson, exclusive of her husband, and upon the trusts declared in the deed or declaration aforesaid.

Sarah Jane Manson died in Bucks County, Pennsylvania, on September 4, 1870, leaving a will, dated April 20, 1865, whereby she directed that her debts be paid, and then devised and bequeathed all her estate real and personal, as follows: Her husband, William L. Manson, to take and receive all the

rents and profits of her estate during his life and apply the same for his support and the support and education of her three children, namely, Frederick L. Manson, William H. Walters (a child of the testatrix by a former husband) and Cecelia M. Manson, and, on the death of her husband, all of her estate, real and personal, to be equally divided, share and share alike, among the said three children, when the youngest of them should reach the age of twenty-one years, and not before. This will was attested by only two witnesses, and was therefore not effectual to pass real estate in the District of Columbia, and was never admitted to probate therein. On September 12, 1870, it was duly admitted to probate in Philadelphia, and letters of administration, with the will annexed, were granted to William L. Manson, the surviving husband.

In her lifetime, Sarah Jane Manson sold a part of the property embraced in the said deeds, but made no sale or conveyance of the said parcel 15.

On June 18, 1874, William L. Manson filed a creditor's bill in the said court against Erastus Poulson, trustee; Frederick L. Manson, William H. Walters and Cecelia M. Manson, stating that all the parties were citizens of the State of Pennsylvania; that Poulson was sued as trustee by virtue of the deeds aforesaid, and the other defendants as heirs at law of Sarah Jane Manson, and that the defendants Frederick L. Manson and Cecelia M. Manson were minors. The bill alleged that Sarah Jane Manson, at the time of her death, was seized of the said parcel of land in her own right, and free from any right or claim of her husband, and died intestate as to the same; that the complainant settled her estate in Bucks County, Pennsylvania, by virtue of said letters of administration, a certified copy of which was filed as an exhibit; that her personal estate proved insufficient to pay her debts, and that the complainant made advances out of his own funds toward the payment of the same, and that such advances, together with the assets of the estate, paid in full all the just claims proven against the decedent; that the complainant paid out of his own funds on such account, over and above

the assets coming into his hands, the sum of $2051.26, which amount was justly due him; and that no funds remained from which he might be reimbursed, unless the said real estate should be sold and the proceeds thereof applied to the payment of his claim. The said deeds were referred to and made a part of the bill. The complainant prayed that a trustee might be appointed to sell and convey the property, and out of the proceeds arising from the sale pay the indebtedness due the complainant and distribute the balance; that guardians *ad litem* might be appointed to appear and defend the interests of each of the said infants; that writs of subpoena might be issued against each of the said defendants Erastus Poulson, trustee, Frederick L. Manson, William H. Walters and Cecelia M. Manson; and that the complainant might have such other and further relief as the nature of the case might require.

Process was issued against all of the defendants, and was returned by the marshal of the District of Columbia not found. Orders were thereupon entered appointing commissioners in Philadelphia and in Fort Clark, Texas, to appoint guardians *ad litem* to take the answers of the infant defendants Cecelia M. Manson and Frederick L. Manson. These commissions were duly executed, and answers of the said infant defendants, by guardian *ad litem*, were duly filed, whereby all interests and rights of the infants were claimed, but submitted to the court. Erastus Poulson, trustee, filed an answer, admitting the allegations of the bill, and submitting himself to the orders of the court. Walter, the other adult defendant, also filed an answer, wherein he claimed all such interest as he might be entitled to, and submitted his rights to the court.

The cause was heard upon the pleadings and upon a certified copy of the confirmed report of the auditor of the orphans' court of Philadelphia, and on March 18, 1875, a decree was entered whereby it was ordered and adjudged that the complainant's claim set forth in said creditor's bill be recognized as a valid lien against the property described therein, and that the property be sold, and the proceeds of sale be applied, first, in satisfaction of all proper taxes and assessments or other prior incumbrances due and unpaid upon

the property, and secondly, to the payment of the claim of the complainant; the balance, if any, to be distributed *pro rata* among the heirs of Sarah Jane Manson. A trustee was appointed, who, after having given notice by advertisement, was to proceed to make the sale as aforesaid, and thereafter to report the same to the court, and upon final ratification thereof to " convey to the purchaser or purchasers, by good and sufficient deed, all right, title and interest of said defendants or any of them, as of said complainant, in and to said property."

The sale, having been duly made and reported by the trustee, was finally ratified on May 18, 1875, and the trustee, W. P. Bell, subsequently conveyed the property to Frederick Volk, the purchaser. Volk afterwards conveyed the same to Louis Schmid, Edward Schmid and Alexander Schmid, and they, by deed dated June 21, 1890, conveyed to Charles C. Duncanson. The proceeds of sale were applied in accordance with the terms of the decree, but there does not appear to have been any balance for distribution among Sarah Jane Manson's heirs at law.

William L. Manson died in the year 1877.

The present suit was commenced, as aforesaid, by Frederick L. Manson, who filed his bill of complaint in the said court on June 20, 1892. The bill set out, in substance, the facts stated above, and alleged that, upon the death of Sarah Jane Manson, the complainant and Cecelia M. Manson and William H. Walters became the owners, by purchase, of the said parcel 15, by virtue of the aforesaid deeds of 1862 and 1865 ; that nothing set out in the said creditor's bill served to give the court jurisdiction of the subject-matter thereof, or of any person mentioned therein, and that the court had no jurisdiction to make any order in the said proceedings except an order dismissing the bill.

It was further alleged that in April, 1873, the complainant, while a minor, enlisted with the consent of his father in the Fourth United States Cavalry, and remained in the army until 1881, when he was honorably discharged; that during the intervening time he was stationed at military posts in Texas

and Kansas, and since his discharge had resided continuously in Illinois and Kansas; that until August 15, 1891, he had no knowledge of the said equity proceedings, or of the said answer or any answer filed or intended to be filed therein in his behalf, or of the existence of the said deeds of 1862 and 1865, or the interest they vested in him, or of the said condemnation proceedings; that shortly after learning of the existence of the deeds, and of the record in the said suit, he filed a petition in the condemnation proceedings, claiming the proceeds of parcel 15, but that, as he was informed, and believed, the court was of opinion that it had no jurisdiction in those proceedings to pass upon contested claims to the said proceeds. The complainant further alleged that his sister, Cecelia M. Manson, left home shortly after his enlistment in the army, and sought her own livelihood; that since the complainant was informed of the property interests in question he had made diligent inquiry concerning the whereabouts of his said sister and of his said brother, William H. Walters, and had been unable to learn anything concerning the whereabouts of his sister since 1880, or of his brother for several years prior thereto, and that therefore he believes them both to be dead, and to have died intestate, leaving the complainant their only heir at law.

The complainant prayed the court to declare that all decrees, orders and proceedings had in the said suit were null and void for want of jurisdiction; that the sale made and the deed executed by the trustee appointed in that suit, as well as all other deeds executed under the decree therein, were void and of no effect; and that the complainant was the legal and equitable owner of parcel 15 at the time of the condemnation of the same, and was entitled to the said fund. He further prayed that the defendant might be enjoined from receiving the fund.

The defendant filed his answer on September 6, 1892, insisting that the said court had before it, by due process of law, all the parties in interest, and therefore had jurisdiction to enter the said decree and to order the said sale, and that the defendant's title, acquired by conveyance under the decree,

was valid. He denied the allegations of the complainant as to the time when he was first informed of the said suit, and alleged that it would be inequitable if the complainant should be allowed the benefit of any alleged defect in the said proceedings in view of the fact of his having waited until the expiration of fourteen years after the death of William L. Manson, who could have testified as to the complainant's knowledge of the proceedings, and until the expiration of sixteen years after the sale before setting up any claim to the property; that since the sale the respective holders of the property had been in the open, notorious and adverse possession thereof under the decree; that the complainant had been guilty of laches, and on that account was not entitled to relief. The defendant asked for strict proof of the alleged death and intestacy of the complainant's sister and brother, provided proof of the same should be material. He prayed that it might have the full benefit of all objections to the bill that could have been raised and availed of upon demurrer thereto.

Replication was entered and testimony taken, and on June 14, 1893, after final hearing, a decree was entered whereby, "it appearing to the court from an examination of the record in equity cause numbered 3796, referred to in this cause, that there was nothing set forth and contained therein to give the court jurisdiction to sell the real estate described therein," it was ordered and adjudged that the decree entered in the said cause was null and void; that the deeds made under that decree were void and passed no title; that the defendant had no title to parcel 15 at the time of the condemnation, and was not entitled to the proceeds thereof; that the defendant's plea of laches be not sustained; and that the fund in the registry of the court be paid to the complainant, his solicitor of record, or assigns.

Duncanson thereupon appealed to the Court of Appeals of the District of Columbia, where the decree of the court below was reversed. Manson then appealed to this court.

*Mr. Walter H. Smith* for appellant. *Mr. Charles H. Armes* was on his brief.

*Mr. William F. Mattingly* for appellee.  *Mr. Henry Wise Garnett* was on his brief.

Mr. Justice Shiras, after stating the case, delivered the opinion of the court.

The only matter for our consideration relates to the validity of the decree of the Supreme Court of the District of Columbia of May 18, 1875, ratifying and confirming the sale of the property in dispute, and that depends upon the solution of the question whether that court had jurisdiction of the person of Frederick L. Manson and of the subject-matter of the suit in which the decree was entered.

There was no service of a subpœna upon Frederick L. Manson, but there was an appointment of a guardian *ad litem* by commissioners appointed by the court; and an answer was taken and filed by such guardian.  Such a method of appointment of a guardian *ad litem* is spoken of in *United States Bank* v. *Ritchie*, 8 Pet. 128, as according to the most approved usage. A full discussion of this subject and of the law as it existed in Maryland prior to the erection of the District of Columbia will be found in the case of *Snowden* v. *Snowden*, 1 Bland, Ch. 550; and the case of *Hammond* v. *Hammond*, 2 Bland, Ch. 306, 350; and wherein the practice of bringing in a non-resident minor by the appointment of a guardian *ad litem*, and thus subjecting him to a decree for the partition of land, and for the sale of lands to pay the debts of a decedent, is recognized as usual and proper.

In the case of *Insurance Co.* v. *Bangs*, 103 U. S. 435, this court held that it was not competent for the Federal courts to appoint a guardian *ad litem* for a non-resident or absent infant, so as to subject him to a purely personal claim.  But it was distinctly admitted that where the infant had an interest in real estate within the State or district, the rule was otherwise, and that the power to appoint a guardian *ad litem* in such a case was founded in the general powers of courts of equity. In this case it was said : " Our attention has been called to several cases in the state courts, in which it has been held that a

decree or judgment could not be collaterally attacked, though rendered in a case where a guardian *ad litem* had been appointed without service of process on the infant. Such are the ·cases of *Preston* v. *Dunn*, 25 Alabama, 507; *Robb* v. *Irwin*, 15 Ohio, 689; and· *Gronfier* v. *Puymirol*, 19 California, 629. All of them are illustrative of the position we have stated; they ·all relate to the interest of the infant in real property in the State."

In the answer, which was sworn to by·the guardian, Frederick L. Manson said that he was an infant under twenty-one years of age, that he claimed such interest in the premises as he was entitled to, and submitted such interest to the protection of·the court. This answer was subscribed and sworn to on the first day of December, 1874. In his testimony, taken in the present case, Manson claims to have been past twenty-one years of age when that answer was made. If so, as the evidence is clear that he was present when the appointment of the guardian was made, he must be deemed to have regarded the answer as his own, and cannot be heard to repudiate it in a collateral proceeding.

Moreover, it may be claimed with some show of reason that if the trust deeds of 1862 and 1865 really vested the legal title to the land in question in Erastus Poulson, subject to the trusts set forth in those instruments, and such is the theory of the complainant's bill in the present suit, he, as trustee, represented all the parties beneficially interested, and they, even if not parties, are bound by the decree unless it is impeached for fraud or collusion between him and the adverse parties.

In *Shaw* v. *Norfolk County Railroad*, 5 Gray, 162, it was said:

"The rule of equity pleading that all persons interested in the subject-matter of the suit, and whose rights may be affected by a final decree, must be made parties to the bill, is subject to several exceptions, which are as well established as the rule itself. . . . It has been held that, where persons are made trustees for the payment of debts and legacies, a suit may be sustained in which the trustees only are either plaintiffs or defendants, without joining the creditors or legatees for whom

they are trustees, and whose rights and interests are directly involved in the case.   *Fenn* v. *Craig,* 3 Y. & Col. Exch. 216.

" Upon this principle, it has been decided by this court that, in a bill concerning the title to the assets of an insolvent debtor, it is sufficient, without joining the creditors, to make the assignees parties, who alone have the right to claim the property, the legal title being in them ; and who are authorized and empowered and whose duty it is, to represent the interests of and to act for all the creditors interested in the trust.   *Stevenson* v. *Austin,* 3 Met. 724.   In like manner it has been determined that a trustee, holding a mortgage in trust for several creditors, may maintain a bill in equity to foreclose, without joining his *cestuis que trustent* as parties."

See also *Winslow* v. *Minnesota & Pacific Railroad,* 4 Minnesota, 313, 317, where it is said : " The principle seems to be well settled that in an action by a creditor to reach trust property, in the hands of administrators or trustees who have the control of, and whose duty it is to protect the property, the *cestuis que trustent* need not be joined as parties. The defence of the trustees is their defence, and their presence in court is not necessary to the protection of their interests."

In the case of *Kerrison, Assignee,* v. *Stewart,* 93 U. S. 155, the question was whether the creditors of an insolvent firm, in whose favor a deed of trust had been executed by the firm, were bound by a decree against the trustee, and this court held that " where a trustee is invested with such powers that his beneficiaries are bound by what is done against him or by him, they are not necessary parties to a suit against him by a stranger to defeat the trust in whole or in part.   In such case, he is in court on their behalf ; and they, though not parties, are concluded by the decree, unless it is impeached for fraud or collusion between him and the adverse party."

With the proper parties before the court, the next question is whether the court had such jurisdiction over the subject-matter of the suit as to protect its decree from attack in a collateral proceeding.

That the bill in this case is collateral in its nature is obvious. It does not seek the correction of errors in the proceedings or

decree in the former case. Its avowed object is to have the former proceedings declared null and void, because taken in a court without jurisdiction of either person or subject-matter.

That the court had jurisdiction to decree the sale of real estate to pay the debts of a deceased debtor and owner is undeniable. The bill contained averments that the complainant was a creditor of the estate of Sarah J. Manson; that the decedent had died intestate as to her real estate situated in the city of Washington and District of Columbia; that the personal estate was inadequate to pay the debts of the decedent; that the decedent, at the time of her decease, was seized of described real estate. These are the usual and necessary allegations of a bill in such a case, and, if found to be true, plainly warranted a decree of sale.

It is true that Erastus Poulson, trustee, was made a party defendant, and that the several deeds of 1862 and 1865, creating and defining the trust, were referred to, and, in effect, made part of the bill, and also copies of the will of the decedent and of letters of administration thereon.

It is claimed, on behalf of the appellant, that the bill did not sufficiently allege the existence of unpaid debts. The allegation in question was as follows:

" Your complainant settled the estate of Sarah J. Manson, deceased, by virtue of certain letters of administration *c. t. a.* issued from the office of the register for the probate of wills and granting letters of administration, in and for the city of Philadelphia, a certified copy of which is hereto annexed and marked Complainant, Exhibit A, as part of this bill ; and the personal estate of the said decedent has been fully and finally administered and the same would have proved insufficient and inadequate to pay the debts of the estate, but your complainant made advances out of his own fund to pay the indebtedness of said estate in full, and said advances, together with assets of the estate, paid in full all the just claims filed and proven against said decedent, and your complainant has paid out of his own funds, on said account, over and above assets coming into his hands, the sum of two thousand and fifty-one dollars, which amount is justly due him, and there

remains no fund from which to reimburse him, unless the real estate hereinbefore described be sold, and so much of the proceeds as may be necessary be applied to the payment of your complainant's claim."

We are unable to accept the appellant's contention that these allegations, taken to be true, do not disclose the existence of debts collectible by proceedings in the district court, and that an administrator with the will annexed cannot be reimbursed for advances made by him in the process of settling the estate.

At all events, even if the district court erred in holding that the allegations and proof were sufficient to establish the existence of a collectible debt, such an error did not invalidate the decree so as to subject it to attack by a collateral proceeding.

The next contention, and one that has been ably argued, is that the bill for a sale showed that the court had no jurisdiction of the subject-matter, because it showed that Sarah J. Manson, the decedent, had no interest in the realty at the time the bill was filed; that she had had a life estate only.

It must be conceded that if the property sold was not owned by the decedent, and was not subject to her debts, the decree of sale was void; and it must also be conceded that, by the allegations of the bill, the court was obliged to take notice of the contents and legal import of the deed creating and defining Poulson's estate as trustee.

It is admitted that the real estate in question was paid for by moneys belonging to Mrs. Manson; that, under the terms of the trust deeds, she had the right to occupy the premises, and to receive the rents and profits thereof for her sole and separate use, her receipt alone being a valid discharge for such rents and profits; that it should be lawful for her, at any time, and from time to time, during her life to dispose of said premises either by absolute sale or mortgage thereof as she might think proper; that, in default of any such sale or mortgage, or so far as the same shall not extend, upon further trust for such person or persons, and for such estate and in such parts, shares and proportions, as she, the said Sarah J.

Manson, should or might, from time to time, by any deed or instrument of writing, or by her last will and testament, under her hand and seal (which will she was authorized to make), limit, direct or appoint, give or devise the same; and in default of any such limitation, direction and appointment, gift or devise, in trust for such child or children as she should leave surviving her and the issue of any deceased child, such issue taking his, her or their parent's or parents' share; and for default of all such children or issue, then in trust for the right heirs of the said Sarah J. Manson forever; and that all money which should or might be raised by sale or mortgage of the said premises or any part thereof should be paid to the said Sarah J. Manson and be disposed of as she should or might think best, her receipt being a valid discharge therefor, the party paying the same not being bound to see to the application or disposition thereof.

The record does not inform us upon what view of the legal import of these provisions the district court proceeded in awarding the decree of sale. It may have been thought that such a trust did not protect the real estate described from the creditors of Sarah J. Manson, either during her life or at her death. *Nichols* v. *Eaton*, 91 U. S. 716. Or the court may have regarded the will of Sarah J. Manson, though not so executed as to permit it to be proven in the District of Columbia, as a sufficient exercise of the power of appointment, in which case, according to a rule well established in England and in this country, where a person has a general power of appointment, either by deed or will, and executes this power, the property appointed is deemed, in equity, part of his assets, and subject to the demands of his creditors in preference to the claims of his voluntary appointees or legatees. *Clapp* v. *Ingraham*, 126 Mass. 200; *Brandies* v. *Cochrane*, 112 U. S. 344.

We do not wish to be understood as intimating that either of such views would have been a sound construction of the trust deed; but we do say that these were questions before the district court for decision, and if any error was committed by that court the remedy was by appeal or by a bill of review if duly filed.

We adopt the language and reasoning of the Court of Appeals in this case :

" It is certainly the policy of the law to maintain judicial sales, and every reasonable inducement should be indulged to uphold them, otherwise the public would become distrustful, and fair prices for property sold under judicial authority would seldom be obtained. Purchasers, while they are required to take notice of the existence and terms of the decrees or judgments under which they purchase, and as to the parties bound thereby, cannot be required to become judicial critics, and to pass in review, at their peril, upon the correctness of the proceedings upon which the judgments or decrees may be founded. As was pertinently said by the Supreme Court of the United States, in the case of *Thompson* v. *Tolmie*, 2 Pet. 168 : ' After a lapse of years, presumptions must be made in favor of what does not appear. If the purchaser was responsible for the mistakes of the court, in point of fact, after they had adjudicated upon the facts, and acted upon them, these sales would be snares for honest men. The purchaser is not bound to see whether the court was mistaken in the facts of debts and children. The decree of the orphans' court in a case within its jurisdiction is reversible only on appeal, and not collaterally in another suit. When a court has jurisdiction it has a right to decide every question that may arise in the cause ; and whether its decisions be correct or not, its judgment, until reversed, is regarded as binding in every other court.'

" These principles apply in all respects and with special force in this case. It was for the court whose decree is attempted to be impeached, not only to decide on the facts before it, but upon the construction and legal effect of all deeds and muniments of title upon which the proceeding was based. The court having general jurisdiction over the subject-matter of decreeing the sale of real estate of a deceased debtor for the payment of debts, it had the right and was required to determine the question as to the liability of the property for the debts, and whether the case was within its jurisdiction ; and though its decision may have been erroneous, it could only be reversed upon a direct appeal."

" It is of no avail," said this court in *Cooper* v. *Reynolds,* 10 Wall. 308, " to show that there are errors in the record, unless they be such as prove that the court had no jurisdiction of the case, or that the judgment rendered was beyond its power. This principle has been often held by this court and by all courts, and it takes rank as an axiom of the law."

And in *Cornett* v. *Williams,* 20 Wall. 226, it was declared that " the settled rule of law is that jurisdiction having attached in the original case everything done within the power of that jurisdiction, when collaterally questioned, is to be held conclusive of the rights of the parties, unless impeached for fraud."

Having concluded that the district court had jurisdiction over the parties and the subject-matter, and that its decree cannot be successfully impeached in this collateral proceeding, it is unnecessary to consider other questions suggested in the record and discussed in the briefs of the counsel.

The decree of the Court of Appeals is

*Affirmed.*