In re WILSON FREIGHT COMPANY, Debtor.

WES–FLO CO., INC., Plaintiff,

v.

WILSON FREIGHT COMPANY and Parks and Parks, Defendants.

Trucks & Trailers, Inc., Additional Defendant on Second Cross-Claim

Reorganization No. 80 B 1129.
Adv. No. 81–5664A.

United States Bankruptcy Court, S.D. New York.

June 28, 1983.

Anderson, Russell, Kill & Olick, P.C., New York City, for debtors; Laurence Y. Solarsh, New York City, of counsel.

Lane & Mittendorf, New York City, for Parks & Parks; Christopher R. Belmonte, New York City, of counsel.

Booth, Lipton & Lipton, New York City, for creditors committee; Peter D. Wolfson, New York City, of counsel.

Juergens, Juergens & Busch, Springfield, Ohio, for Wes-Flo, Inc.; Thomas H. Busch, Springfield, Ohio, of counsel.

## DECISION AND ORDER ON CONTESTED SALE OF ASSETS

BURTON R. LIFLAND, Bankruptcy Judge.

An adversary proceeding was originally commenced by Wes-Flo Co., Inc. ("Wes-Flo") against the debtor, Wilson Freight Company ("Wilson") and Parks and Parks Auction Sales Managers, Inc. ("Parks and Parks") in an Ohio state court on July 1, 1981. The subject matter concerns the administration of the Wilson reorganization estate and this Court's orders approving the sale of the debtor's property. As such, this is not a related matter as defined in Emergency Rule (d)(3)(A) promulgated locally in response to the Supreme Court's ruling in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 454 U.S. 1029, 102 S.Ct. 564, 70 L.Ed.2d 472 (1982). Upon application of Wilson, the action was removed to the U.S. Bankruptcy Court for the Southern District of Ohio, Western Division at Dayton pursuant to 28 U.S.C. § 1478 and Interim Bankruptcy Rule 7004(a). Thereafter, venue was transferred to this Court where Wilson's Chapter 11 reorganization proceedings are pending pursuant to 28 U.S.C. § 1475. A trial of the issues ensued.

This proceeding stems from an auction sale of a part of Wilson's property pursuant to Section 363 of the Bankruptcy Code ("the Code"). Parks and Parks was the auctioneer at the sale and Wes-Flo was one of the bidders. Wes-Flo, as the highest bidder for 88 Mack Tractors ("Macks"), seeks damages for Wilson's alleged refusal to convey the 88 Macks after the auction sale. In addition, Wes-Flo seeks damages for the alleged use by Wilson of an agent or employee of Wilson to bid for Wilson at the auction (a "shill bidder") without informing the other bidders as required by Ohio Revised Code Section 1302.41(d). Wilson and Parks and Parks deny the use of a shill bidder to bid for Wilson at the auction sale and assert that Wes-Flo's bids on the 88 Macks were properly rejected pursuant to the announced terms and conditions of the auction sale.[1]

### Factual Background[2]

Wilson was primarily in the business of acting as a common carrier of freight in interstate and intrastate commerce. On July 23, 1980, Wilson[3] filed a petition pursuant to Chapter 11 of the Bankruptcy Code[4] with this Court. Wilson has remained in possession and control of its business as a debtor in possession.

Subsequently, Wilson sought to sell a number of its 1978 and 1979 Macks by granting an option to purchase the Macks to Truck Central, Inc. (now casted as Trucks and Trailers). The option to purchase was not fully exercised, and at the

---

1. Wilson and Parks and Parks cross-claimed against each other for any liability that may arise from Wes-Flo's action against them. Furthermore, Parks and Parks cross-claimed against Trucks & Trucks, Inc., a competitor of Parks and Parks, who prior to the auction had an option to purchase the Macks at a set price. This cross-claim alleges that Trucks & Trailers, Inc. intentionally interfered with the auction. As to Trucks & Trailers, Inc., this proceeding is stayed because they have filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. Based upon the holding herein exonerating Parks and Parks and Wilson from liability, all of the cross-claims are dismissed.

2. This opinion constitutes findings of fact and conclusions of law in accordance with Bankruptcy Rule 752.

3. At the same time, six of Wilson's wholly-owned subsidiaries also filed a petition for reorganization under Chapter 11 of the Bankruptcy Code.

4. The Bankruptcy Code, adopted as part of the Bankruptcy Reform Act of 1978, Pub.L. 95–598, 92 Stat. 254, was enacted on November 6, 1978 and is applicable to all bankruptcy cases commenced subsequent to September 30, 1979.

end of the option period, a considerable number of 1978 Macks were still unsold. The option price to Truck Central, Inc. for each of the 1978 Macks was set at $21,500.

Wilson then sought authorization to hire an auctioneer pursuant to Section 327 to sell the 1978 Macks and a portion of its personal property.[5] The order was consented to and signed by the Official Creditors' Committee, Citibank, N.A., who had liens on the Macks, and the United States Trustee for the Southern District of New York ("the U.S. Trustee"). An order authorizing the employment of Parks and Parks as the auctioneer was entered on April 10, 1981. The auction was scheduled for April 22, 23, 24 and 25, 1981.

Wilson applied for an order waiving notice to creditors of the auction sale which is required by Section 363(b) of the Code. The application also stated that Wilson would have final approval as to the acceptability of the proceeds obtained for the Macks. The order was consented to and signed by the Official Creditors' Committee, Citibank, N.A. and the U.S. Trustee. The order waiving notice was entered on April 13, 1981.

Subsequently, Wilson established a minimum price of $18,500 for each of the 125 Macks to be offered at the auction sale. Wilson applied for an order waiving notice to creditors concerning the establishment of a minimum price. Wilson thereby proposed that no Macks be sold for less than $18,500 and that it retain the right of final approval of the price obtained for any of the Macks. The application also proposed that the Macks be sold free and clear of all interests with any such interest attaching to the net proceeds of sale of the Macks. The order was consented to by the Official Creditors' Committee, Citibank, N.A. and the U.S. Trustee and was entered by this Court on April 21, 1981.

However, the advertisements of the auction only stated that it was a bankruptcy auction. Parks and Parks who provided the advertisements was not informed of the minimum price requirement until after the advertisements were disseminated. In fact, Charles Parks, President of Parks and Parks, was only informed on the night of April 21, 1981 that the sale of the Macks would be subject to an $18,500 minimum price. After consultation with Mr. Solarsh of the firm of Anderson, Russell, Kill & Olick, counsel for Wilson, Mr. Parks, concerned with chilling of the bidding, decided not to announce the exact minimum price publicly. Instead, he elected merely to state that the Macks would be sold subject to subsequent approval ("with an if").

Wilson contends that on April 22, 1981, before the auction commenced, Mr. Parks, the auctioneer, and Mr. Solarsh made statements to the effect that all sales of the Macks were subject to subsequent approval of the bid. Art Perry, Wes-Flo's president, was present at the auction sale at the time the announcements were made.

The auction commenced and upon each sale the hammer was struck down with the statement "sold with an if". Wes-Flo contends that unknown to the other bidders, a shill bidder made bids in various amounts during the first three sales of Macks in an attempt to get the bidding up beyond the minimum price. However, there were no higher bids than his and thus the auctioneer had to strike the hammer down as if sold. Wes-Flo alleges that Wilson had a Mr. Pittman, who it contends was the shill bidder, sign the invoices for the three Macks indicating their purchase, although not actually purchasing them. Since the bids for these three Macks did not reach the $18,500 minimum price, these Macks were not sold. The evidence adduced at trial, however, failed to establish that Mr. Pittman was anything other than an independent bidder who was

---

5. At the time of filing its Chapter 11 Petition, Wilson discontinued its general and special commodities division and thereafter sought to sell all the personal property involved in that division. Wilson sought to obtain a reasonable bulk offer for this property but was unsuccess-ful. Thus, placing the personal property up for auction was chosen as a means to sell the property. No dispute has arisen concerning the sale of the personal property at the auction sale.

the successful offeror for other lots. The uncontroverted testimony made it clear that Mr. Pittman was unaware at the time of the bidding that the sale of the three Macks was ascribable to him.

The auction on the rest of the Macks continued and Mr. Perry was the high bidder for 88 of the Macks. None of Mr. Perry's bids reached the $18,500 minimum price. Upon each sale, Mr. Perry signed an invoice and a number of these invoices contained a handwritten statement "sold on approval". After the auction was completed, an examination of the invoices for the Macks revealed that no bid reached the $18,500 minimum price. Therefore, Wilson informed all the purchasers who had signed invoices, including Wes-Flo, that their bids were rejected and no sales would occur.

Subsequently, this adversary proceeding was commenced by Wes-Flo seeking damages for the failure of Wilson and Parks and Parks to convey the 88 Macks. At trial, Wes-Flo called Frank Fieu, an industrial broker, as a witness to testify as to the damages incurred by Wes-Flo due to Wilson's failure to deliver the Macks at issue. At best, Fieu's testimony merely established an understanding between Wes-Flo and Fieu whereby Fieu as a broker would attempt to sell the 88 Macks upon their delivery to Florida. Fieu's testimony does not establish that he entered into any binding agreements for the sale of the Macks Wes-Flo was to obtain from Wilson.

*Conclusions of Law*

█ The issue presented in this action is whether Wes-Flo is bound by the minimum price condition placed on the auction sale by Wilson. The sale was conducted pursuant to Section 363 of the Code, and it is the applicability of subsections 363(b), sale out of the ordinary course of business, and 363(f), sale free and clear of any interest, that the Court will address.

Under the predecessor Bankruptcy Act, it was the general policy of the bankruptcy courts to uphold such sales "so as to engender and maintain their stability and the integrity of the process." 4B *Collier on Bankruptcy* (14th ed. 1978) § 70.98[17]; every "reasonable inducement will be indulged to uphold" an auction sale, *In re M & M Transportation Co.,* 13 B.R. 861, 867 (Bkrtcy., S.D.N.Y.1981), *quoting Manson v. Duncanson,* 166 U.S. 533, 17 S.Ct. 647, 41 L.Ed. 1105 (1897), provided that there is no taint by fraud or misrepresentation. *In re M & M Transportation Co.* at 867. In a similar spirit, the conduct of the sale by the debtor under the Code is to be accorded due respect by a court.

Wilson as a debtor in possession was authorized to conduct the auction sale. *See, e.g.,* 2 *Collier on Bankruptcy* ¶ 363.03[1] (15th ed. 1982). Under the Code, the conduct of an actual sale itself, pursuant to Section 363, has been left to the discretion of the trustee or the debtor in possession.[6] Depending upon the circumstances, the items of property at an auction can be sold either at "absolute" auction or subject to rejection of the highest bid. *See 2 Norton, Bankruptcy Law and Practice* § 11.23 (1982).

In the instant case, the debtor, the Official Creditors' Committee, Citibank, N.A. and the U.S. Trustee consented beforehand to the above-described terms and conditions of the auction sale. Judicial approval of the sale with the agreed upon terms and conditions was clearly evidenced by the or-

---

**6.** Although the court no longer actually conducts the auction sale, *see* 4 B Collier on Bankruptcy ¶ 70.97 (14th ed. 1978); 3 Collier Bankruptcy Practice Guide ¶ 43.02[1] (1982), it nonetheless retains authority and discretion in setting and monitoring guidelines for the sale. For example, under Section 363(b), a judicial hearing is required if there are any objections to the proposed sale. *See* 2 Collier on Bankruptcy ¶ 363.03 at 363–13 (15th ed. 1982). Also, under Section 363(f), an adversary proceeding must be commenced pursuant to Bank-

ruptcy Rule 701(3) in order to sell property free and clear of any interest. *See, e.g., In re Ballard,* 4 B.R. 271, 277 (Bkrtcy.E.D.Va.1980). Additionally, under the Code, the Court maintains its responsibility to insure the adequate protection of the estate's assets. *See, e.g., In re Alisa Partnership,* 15 B.R. 802, 803 (Bkrtcy.D.Del. 1981), where the court set aside a public sale and ordered the property resold because the highest offer received at the public sale was grossly inadequate.

ders of this Court. Wilson validly reserved the power to reject any bid which did not reach the minimum price of $18,500.

Wes-Flo contends that Wilson is required to turn over to it the 88 Mack trucks. Plaintiff cites Ohio Rev.Code Section 1302.-41 [Ohio's version of UCC Section 2–328] in support of its position: This section provides: "A sale by auction is complete when the auctioneer so announces by the fall of the hammer or in other customary manner." *See* Ohio Rev.Code Section 1302.-41(b); UCC Section 2–328(2).

This subsection has not been so narrowly construed as to prevent a seller from conditioning the sale to his subsequent approval of the accepted bid price. In *Dulman v. Martin Fein & Co., Inc.*, 66 A.D.2d 809, 411 N.Y.S.2d 358 (2d Dep't 1978), the court allowed the imposition of such a condition, stating:

"Paragraph (b) of subdivision (2) of section 1–102(b) of the Code specifically provides that one of the Code's underlying purposes and policies is: "to permit the continued expansion of commercial practices through custom, usage and agreement of the parties". To read section 2–328 as precluding the imposition of fair and reasonable conditions on the auction sale of goods to merchants would fly in the face of one of the Code's most important policies." *Id.* 411 N.Y.S.2d at 361.

Furthermore, the Code grants the debtor substantial discretion as to the method of conducting the sale and as to negotiating and obtaining bids. The restrictive interpretation requested would thus contravene common commercial practice and the debtor's paramount duty to obtain the best price. *See* 3 Collier Bankruptcy Practice Guide § 43.02[3] (1982).

The owner has the right to condition the sale of his property, *Jones v. Tennessee Valley Authority*, 334 F.Supp. 739, 743 (M.D.Fla.1971) and Wilson properly did so in this case. As the Collier Bankruptcy Guide explains:

The trustee may want to fix an upset price or, in an auction sale, to offer the property with reserve, that is with the right to reject even the highest offer on the grounds of inadequacy.... [T]he trustee must exercise great care in preparing the terms of the notice which should clearly set forth the relevant information[7] ... 3 Collier Bankruptcy Practice Guide ¶ 43.02[3] (1982).

Moreover, the terms and conditions of the sale announced by Mr. Parks, the auctioneer, and Mr. Solarsh were binding on Wes-Flo regardless of whether its bidder, Art Perry, knew or heard them. *Coleman v. Duncan*, 540 S.W.2d 935, 938 (Mo.App.1976); *Matter of Premier Container Corp.*, 95 Misc.2d 859 at 866, 408 N.Y.S.2d 725; *In re Sapolin Paints, Inc.*, 11 B.R. 930, 936 (1981).

█ Accordingly, Wilson validly reserved and exercised the authority to reject any bid which did not reach the $18,500 minimum price and is not liable to Wes-Flo.

█ Moreover, Parks and Parks cannot be held liable in this action. The auctioneer, Parks and Parks, acted as the agent for a disclosed principal, Wilson. As such, Parks and Parks did not become a party to any contract that may have been formed. If a contract was entered into, Parks and Parks cannot be held liable for its nonperformance. *See* Restatement 2d Agency §§ 320, 328 (1979). In *Dulman v. Martin Fein & Co., Inc.*, 66 A.D.2d 809, 411 N.Y.S. 358 (2nd Dept.1978), the court declared that an action for damages due to a principal's failure to deliver goods to a successful bidder would not lie against an auctioneer if

---

**7.** However, Interim Rule 2002 permits the debtor to dispense with the notice consistent with Rule 2003(a)(2). The court, pursuant to Rule 2003(a)(2), can order that no notice is required when cause is shown but may direct that notice be given to the creditors' committee or that publication be made pursuant to Rule 2003(b). In the instant case, this court ordered that no notice to creditors is required to establish a minimum price. Subsequently, the creditors' committee, Citibank, N.A., and the U.S. Trustee waived their right to ten-days notice. Proper cause for this dispensing with notice was shown when Wilson put forth that the mailing of notice to creditors would cost the estate in excess of $7,000, plus a substantial delay in time which would, in turn, cause delay of the scheduled auction.

the auctioneer had fully disclosed its principals. *Id.* at 810, 411 N.Y.S.2d 358.

Parks and Parks, as agent for Wilson, was obliged to follow the instructions of its principal. *Matter of Premier Container Corp.*, 95 Misc.2d 859, 866, 408 N.Y.S.2d 725, 729 (Sup.Ct.Queens Co.1978), and therefore will not be held liable for the imposition of the upset price. It is also the

> "auctioneer's right and duty to invite and excite the competition of bidding and to dispose of the property to highest bidder for the highest price, and the precise methods by which this is done is vested in the discretion of the auctioneer." *Jones v. Tennessee Valley Authority,* 334 F.Supp. 739, 743 (M.D.Fla.1971).

Mr. Parks, while constrained by an unannounced upset price, did his best to excite the bidding beyond the limitation. The fact that the bidders failed to bid high enough should not render Parks and Parks liable.

■ Wes-Flo's second cause of action for Wilson's alleged use of a shill bidder on the sale of 3 Macks without informing the other bidders as required by Ohio Revised Code § 1302.41(d) [Ohio's version of UCC 2–328(4)] is without merit. Assuming arguendo that a shill bidder was employed, the statute provides the successful bidder with two options: 1) avoid the sale; or 2) take the goods at the price of the last good faith bid price to the completion of the sale. Wes-Flo has opted for the latter. However, this option does not eliminate Wilson's properly reserved right to reject any bids which do not reach the $18,500 minimum price. Therefore, this option is moot because the bidding for the 3 Macks in question never reached the $18,500 minimum price.

Since this court has found that Wes-Flo has no valid causes of actions arising from Wilson's failure to deliver the 88 Macks, the Court need not address the issue of whether Wes-Flo sufficiently established the requisite element of damages necessary to sustain a contract cause of action under Article 2 of the Uniform Commercial Code. Furthermore, as the sale dealt with property of the estate sold under the aegis of this Court, those state statutes governing the conduct and rights of parties at auction sales, where inconsistent, are interdicted by the bankruptcy court's authority in the area. *See* footnote 6 *supra.*

Upon all of the foregoing, this Court holds that Wes-Flo's causes of actions against Parks and Parks and Wilson are dismissed. It is SO ORDERED.