**In re NextWAVE PERSONAL COMMUNICATIONS, INC., et al., Debtors.**

**NextWave Personal Communications, Inc., Plaintiff,**

**v.**

**Federal Communications Commission, Defendant.**

**Bankruptcy No. 98 B 21529(ASH).**

**Adversary No. 98–5178A.**

United States Bankruptcy Court, S.D. New York.

Feb. 16, 1999.

Andrews & Kurth L.L.P, By Deborah L. Schrier–Rape, Dallas, TX, for plaintiff/debtor.

Mary Jo White, United States Attorney for the Southern District of New York, By Daniel S. Alter, New York City, for defendant.

## DECISION ON PARTIAL SUMMARY JUDGMENT MOTION

ADLAI S. HARDIN, Jr., Bankruptcy Judge.

Nextwave Personal Communications, Inc. ("Nextwave" or "debtor") commenced this adversary proceeding to set aside its aggregate $4.7 billion of transfers and obligations to the Federal Communications Commission ("FCC") incurred in its acquisition of 63 broadband Personal Communication Services licenses ("C Block licenses") as a constructive fraudulent conveyance under 11 U.S.C. § 544(b). The FCC has moved for partial summary judgment under Bankruptcy Rule 7056(b) to determine the effective date of Nextwave's $4.74 billion of transfers and obligations for purposes of Section 544(b). As set out below, I find that the effective date of the debtor's $4.74 billion of transfers and obligations under Bankruptcy Code Section 544 is January 3, 1997.

### Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a) and 157(a) and the standing order of reference of Acting Chief Judge Robert J. Ward dated July 10, 1984. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(H).

### Undisputed Facts

The following facts are undisputed by the parties. The FCC conducted an auction of C Block licenses from December 18, 1995 to May 6, 1996, and a reauction of C Block licenses from July 3 to July 16, 1996. The debtor participated in the bidding in both of these auctions and was declared the high bidder on May 8, 1996 for 56 C Block licenses and on July 23, 1996 for an additional 7 reauctioned C Block licenses, for a total of 63 C Block licenses.

As part of the FCC's auction process, bidders were required to deposit "qualifying amounts" in order to participate in the auction. The debtor deposited qualifying amounts of $79,225,000 on December 1, 1995 and $6,984,244 on June 13, 1996. After the debtor was declared the winning bidder on May 6, 1996 as to the 56 C Block licenses, it deposited an additional $130,834,333 on May 10, 1996 and further deposit of $20.138.825 on July 23, 1996 when it was declared the winning bidder for the 7 C Block licenses. The debtor's deposits at the close of the bidding process totalled $237,182,402, or approximately 5% of the $4.7 billion it bid for all 63 C Block Licenses.

Following the close of the auction process, FCC regulations required the debtor to submit applications for approval of the issuance of the 63 C Block licenses. The debtor submitted applications as to the 56 and 7 C block licenses on May 22 and July 17, 1996, respectively. While these applications were pending, two rival bidders, Antigone Communications L.P. and PCS Devco, Inc., petitioned the FCC to deny the debtor's applications on various grounds. The FCC investigated the matter and found that certain elements of Nexwave's capital structure exceeded statutory foreign ownership benchmarks. In response, the debtor filed a restructuring plan with the FCC on December 30, 1996 to bring its capital structure into compliance with FCC regulations. On January 3, 1997, the FCC conditionally granted licenses for all 63 C Block licenses, subject to the debtor's implementation of its proposed capital restructuring plan.

Following the FCC's January 3, 1997 license grant, the debtor was required to deposit an additional 5% of the total $4.74 billion bid price, or a further $237 million. The debtor deposited this additional amount on January 9, 1997, raising its total deposits to $474 million. On February 19, 1997 the debtor signed notes dated January 3, 1997 in the aggregate principal

amount of $4.27 billion (the "Notes") for the balance of the $4.74 billion it bid at auction.

### Discussion

The parties dispute the date on which the debtor incurred its $4.74 billion obligation to the FCC. That date is relevant for purposes of the debtor's avoidance claim under Bankruptcy Code Section 544(b), which provides in pertinent part:

> The trustee may avoid any transfer of an interest of the debtor in property *or any obligation incurred* by the debtor that is voidable under applicable law . . .

11 U.S.C. § 544(b) (emphasis added). Because the FCC has moved only for a determination of that date, this decision is limited to a finding of fact and conclusion of law as to that date and does not address any remaining factual or legal issues regarding the debtor's Section 544 claim.

The FCC argues that the debtor incurred its obligations when "the hammer fell" at the C Block auctions on May 8 and July 23, 1996. The debtor argues that it did not incur the obligations at issue in this proceeding until at least January 3, 1997,[1] the date on which the FCC conditionally granted the licenses and the effective date of the Notes.

The resolution of this motion must follow from identifying precisely which obligation the debtor seeks to avoid. Stripped to its essential proposition, the debtor's Section 544 claim is that it did not receive reasonably equivalent value in the C Block licenses it was granted in return for its $4.74 billion obligations. To measure the reasonable equivalence in value of the C Block licenses and the obligations incurred therefor, one must ask (i) when did the debtor receive the licenses and (ii) when did it become obligated to pay for them. These questions are determined by the rules governing the auction itself. *See In re Wilson Freight Co.*, 30 B.R. 971, 975

(Bankr.S.D.N.Y.1983) (announced terms of auction binding upon participants). Those rules are found in the FCC regulations governing the auction process at 47 C.F.R. §§ 1.2101–1.2111, entitled "Subpart Q, Competitive Bidding Process."

With regard to question (i), both sides agree that the winning bidder neither received nor became entitled to receive the C Block licenses upon being declared the winning bidder under the FCC regulations. The winning bidder must apply to the FCC, complete the regulatory approval process and perhaps (as in this debtor's case) overcome objections. The winning bidder has no legal right to receive or utilize the licenses bid upon unless and until its application is approved by the FCC. All the debtor received on May 8 and July 23, 1996 when it was declared high bidder was the exclusive right to apply for the 63 licenses. As stated by the FCC's counsel at a hearing in this Court on January 28, 1999 (Tr. at 15):

> THE COURT: Wait a second. You're asking for words, namely, "reasonably equivalent value" and that raises a question of value for what? And equivalent to what?
>
> MS. SCHWARTZ: To what they got.
>
> THE COURT: What did they get?
>
> MS. SCHWARTZ: What they got was the right to apply for these licenses that were essential to their business. And without those licenses, they would have no business.

Thus, the debtor did not become entitled to receive the 63 C Block licenses until at the earliest the January 3, 1996 decision of the FCC granting the debtor's applications.

Under FCC regulations, once bidding has ended the FCC must notify the high bidder and declare bidding closed. 47 C.F.R. § 1.2107(a). Within five days of the notification, the winning bidder who is

---

**1.** While it did not actually execute its Notes for the balance of its bid until February 19, 1997, the debtor does not contest using the

effective date of the Notes, January 3, 1997. (Debtor's Memorandum at 8, note 2).

a "qualified designated entity" (as is the debtor) must bring its total deposits up to 10% of its bid as a downpayment. 47 C.F.R. § 1.2107(b). Significantly, once the downpayment is tendered, the FCC holds the downpayment:

> until the high bidder has been awarded the license and has paid the remaining balance due on the license, in which case it will not be returned, or until the winning bidder is found unqualified to be a licensee or has defaulted, in which case it will be returned, less applicable penalties.

*Id.* In other words, one of three events must occur after the winning bidder tenders the downpayment but before award of the license: either the winning bidder pays the balance of the bid, in which case the downpayment is applied toward the license, or the winning bidder defaults, or the winning bidder is disqualified. Significantly, if the winning bidder defaults or is disqualified, although penalties may be assessed under Section 1.2104, the downpayment must be returned net of any penalties [2].

Nor is the obligation on the full amount of the bid fixed upon tender of the downpayment. A winning bidder who timely submits its downpayment must also submit a "long-form" application for license approval in its respective areas of service. 47 C.F.R. § 1.2107(c). If the bidder fails to timely submit its application, it is deemed to have defaulted and is subject to Section 1.2104 penalties. *Id.* The bidder's default subjects it to applicable penalties to be subtracted from the downpayment, but does not leave the bidder liable on the full amount of the bid.

These provisions make it clear that the debtor was not legally bound on the full amount of its winning bid upon being declared the high bidder. At the "fall of the hammer" the debtor did incur a potential

liability in the event that it either defaulted or was disqualified (neither of which occurred in this case), but under the FCC regulations that potential liability was quite different from the amount of the winning bid.

The potential default liability incurred at the fall of the hammer consisted of penalties calculated on the basis of the difference between the winning bid and the winning bid at any subsequent reauction if any, plus applicable percentage penalties. *See* 47 C.F.R. § 1.2104. Nothing in this calculation explicitly or implicitly binds the winning bidder to the full amount of its bid. Indeed, the express requirement that the downpayment be refunded less any penalties in the event of default or disqualification negates any implied liability for the full amount of the bid. The penalty obligations upon default or disqualification are entirely separate from—and mutually exclusive of—the obligations the bidder would incur upon granting of the license and tender of the balance of the bid. Whether the debtor might have been liable for any of these penalty amounts is not at issue.

Having determined that the debtor's liability for the full amount of the obligation did not attach upon its being declared the high bidder, nor upon tender of the downpayment or even submission of the license approval application, the issue remains as to when the full liability did attach.

The auction rules provide that the grant of a license is expressly conditioned upon payment of the balance of the obligation. Section 1.2109(a) provides:

> Unless otherwise specified in these rules, auction winners are required to pay the balance of their winning bids in a lump sum within five (5) business days *following award of the license. Grant of the license will be conditioned on full and timely payment of the winning bid.*

---

**2.** It appears that one party in the bidding process, BDCPS, Inc., in fact failed to timely submit its downpayment, thereby defaulting, and was assessed a penalty in accordance

with Section 1.2104, but there is no indication that the full amount of its high bid was assessed. (Exhibit J to debtor's Memorandum in Opposition).

47 C.F.R. § 1.2109(a) (emphasis supplied). If the bidder fails to satisfy Section 1.2109(a), the license application is deemed dismissed, the bidder is liable for Section 1.2104 penalties against the downpayment, and the FCC may either reauction the license or offer it to the next highest bidder. 47 C.F.R. § 1.2109(b). Similarly, any bidder who is found unqualified, defaults in timely remitting the balance of the bid or is disqualified becomes liable for Section 1.2104 penalties, after which the FCC may conduct a new auction. *Id.* Taking these sections together, had the debtor failed to tender the balance or otherwise defaulted, it would have been liable only for the Section 1.2104 penalties against its downpayment. Thus the earliest date at which the debtor could have been liable for the full amount of its bid obligations is the date it complied with Section 1.2109(a) by paying the balance of its cash obligations and issuing the Notes. The debtor complied with Section 1.2109(a) effective at the earliest on January 3, 1996 by tendering the balance of its bids in cash and the Notes. It thereby became liable for the full amount of its bid obligations by reason of its Notes.

To summarize, under the FCC regulations it is clear that the debtor incurred a contingent liability for default by entering into the bidding process and by being declared the high bidder. However the contingent default obligations that the debtor might have incurred by participating in the bidding process (which were never actually incurred by the debtor) were quite different from the debtor's obligations for the full amount of its bids, which only became fixed upon its tender in cash and the Notes of the balance due on the C Block licenses granted on January 3, 1997. That obligation, not the contingent penalty obligations, is the subject of the debtor's Section 544 avoidance action.

It is apparent that the FCC's position on this motion is incongruent both with its own regulations and with the debtor's claim in this adversary proceeding. The constructive fraudulent conveyance claim asserts that the aggregate consideration given by the debtor effective January 3, 1997 for the 63 licenses (*i.e.,* the cash transfers totalling $474 million and the Notes totalling $4.26 billion) was not reasonably equivalent to the value of the licenses granted on January 3, 1997. In arguing that May 8 and July 23, 1996 are the debtor's liability dates for valuation purposes, the FCC focuses not on the actual $4.7 billion purchase price which became effective January 3, 1997, but on debtor's contingent exposure to default penalties which were never incurred and never could be incurred if the licenses were granted. Moreover, the property to be valued—the licenses—was not granted in May and June 1996, but on January 3, 1997.

For the foregoing reasons, I find as a matter of fact and law that the date upon which the debtor incurred its obligations to the FCC for purposes of Bankruptcy Code Section 544(b) is January 3, 1997.[3]

\* \* \*

Counsel for the Nextwave and the FCC are directed to confer and jointly prepare an order, agreed as to form, consistent with this decision, without prejudice to the FCC's right to appeal.

---

**3.** The January 3, 1997 date is based upon the date of the FCC's decision granting the licenses and constitutes the earliest effective date of the debtor's obligations for purposes of this adversary proceeding under Section 544. This ruling is without prejudice to the right of either party to argue that a later date should be determinative if the difference is material.